UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:07-CR-124 |
| | ) | (VARLAN/SHIRLEY) |
| MICHAEL RODNEY SHARP, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court,

as may be appropriate. The Defendant is charged in a nine-count indictment [Doc. 19], with

numerous instances of: being a felon in possession of a firearm in violation of 18 U.S.C.§ 922(g)(1);

being a felon in possession of a stolen firearm in violation of 18 U.S.C. § 922(j); and possession of

a firearm with a barrel length of less than 18 inches without registering it in the National Firearms

Registration and Transfer Record in violation of 26 U.S.C. § 5861(d).

This case came before the Court for a hearing on March 2, 2009, to address a number of

pending evidentiary motions and pretrial motions. Assistant United States Attorney Tracy Stone

("AUSA Stone") was present representing the Government. Attorney Ralph Harwell ("Attorney

Harwell") was present representing the Defendant, who was also present. The Court heard the

evidence presented and the arguments of the parties on the motion.

As stated in its Memorandum and Order [Doc. 59], after reviewing the motions and

memorandums of the parties and the affidavit of John Daniel Hurst, the Court found that the

Defendant had made a substantial preliminary showing that a <u>Franks</u> hearing was appropriate. Accordingly, the Motion for <u>Franks</u> Hearing **[Doc. 44]** was **GRANTED**. Because the <u>Franks</u> hearing issues and the suppression issues were inextricably intertwined, evidence on both issues were taken concurrently at the hearing.

After the conclusion of the hearing, the Defendant was given until March 30, 2009, to file a supplemental memorandum, and the Government was given until April 13, 2009, to respond to the Defendant's memorandum. [Doc. 55]. On March 30, 2009, the Defendant filed a Motion for Leave to File "Late Filed" Motion [Doc. 56] which requested leave to file an additional Motion to Suppress addressing only the search of the gun cabinet(s) issue [Doc. 57]. The Government responded on April 13, 2009; said Response [Doc. 60] objected only to the merits of the arguments raised in the above Motion to Suppress [Doc. 57].

Neither party's supplement addressed the merits of the issues at the original suppression the hearing. Instead their supplemental filings addressed another issue raised, but not litigated, to wit: the consent search of a gun cabinet at the Defendant's father's home. Nonetheless the Court could not undertake consideration of the issues presented herein until the time for supplementing the hearing had past. Thus, the Court took the motion under advisement on April 14, 2009.

**I. FACTS**

At the hearing, the Court heard from six witnesses. Their testimony is summarized as follows.

## A. Detective Joe Gilvin

Detective[1] Joe Gilvin ("Det. Gilvin") explained that prior to retiring in May 2008 he served six or seven years as a detective for the Anderson County Sheriff's Department ("ACSD"). Det. Gilvin testified that he had been with the ACSD for fourteen years and had, in total, served over thirty years as a law enforcement officer.

AUSA Stone presented a warrant signed by Anderson County General Sessions Judge Don A. Layton dated January 30, 2007, at 11:35 a.m., and the underlying affidavit sworn to and signed by Det. Gilvin and dated January 30, 2007, at 11:34 a.m. Det. Gilvin identified these documents, and they were received into evidence as **Exhibit 1** without objection. After reviewing the affidavit and warrant, Det. Gilvin stated that he did not see any inaccuracies in the documents. Det. Gilvin confirmed that he was involved in investigating the crimes described in the warrant. He explained that John Daniel Hurst ("Mr. Hurst"), the informant referenced in both documents, was arrested at a pawn shop in south Clinton on January 27, 2007, at about 4:00 p.m. Det. Gilvin stated that he arrived on the scene after other officers and upon arrival spoke with Mr. Hurst about where he was the night before. Det. Gilvin said that he did not speak to Mr. Hurst except to ask about the previous night and maintained that he had never seen Mr. Hurst before he arrived at the pawn shop.

Det. Gilvin confirmed that he later spoke with Mr. Hurst at the Anderson County Detention Center. Det. Gilvin testified that Lieutenant Ronnie Braden ("Lt. Braden") was present when he spoke to Mr. Hurst at the detention center. Det. Gilvin recalled that Mr. Hurst was advised of his

---

[1]Detective Gilvin testified since the events pertinent to this hearing he has retired from the Anderson County Sheriff's Department and now works as a security deputy at the juvenile court in Anderson County. While Gilvin is now a deputy rather than a detective, the Court will refer to him as Detective Gilvin for consistency and simplicity.

rights prior to any discussion or questioning, but Det. Gilvin did not have a copy of the rights waiver. Det. Gilvin stated that Lt. Braden witnessed the waiver.

Det. Gilvin recalled that during their conversation, Mr. Hurst denied that he had broken into anything in Anderson County because he lived there and said that he, and his cohorts Jason Lawson ("Mr. Lawson") and Jason Lee ("Mr. Lee"), 'worked' only in Knox County—specifically, they targeted shopping centers, gay bars, and expensive cars. Det. Gilvin said that after discussing locations he and Mr. Hurst's conversation turned to disposal of the stolen goods. Det. Gilvin stated that Mr. Hurst provided the places and people he took his good to including the Defendant, Michael Sharp. The Defendant's name caught Det. Gilvin's attention. Det. Gilvin explained that he had heard the Defendant's name a lot in investigating other crimes. Mr. Hurst told Det. Gilvin that he had been to the Defendant's residence the day before and had traded stolen goods for Oxycontin pills.

Based on this statement, Det. Gilvin said he obtained the first warrant, previously identified as Exhibit 1. This search warrant issued on January 30, 2007. Det. Gilvin also said that he turned the information he received from Mr. Hurst over to the ACSD and Knoxville Police Department ("KPD"). He recalled one location that he had given other officers based on his conversation with Mr. Hurst. Det. Gilvin also testified that the portion of the first warrant which stated that officers had recovered items from locations identified by Mr. Hurst was true. Det. Gilvin confirmed that Mr. Lawson was taken around to locations where he and the other suspects had fenced stolen property, but Det. Gilvin said he did not know which officers took Mr. Lawson. Det. Gilvin stated that both Mr. Hurst and Mr. Lawson gave officers the same information about where items could be found, but only Mr. Hurst mentioned the Defendant.

4

AUSA Stone then showed Det. Gilvin three photographs of young men, which were received into evidence without objection as **Exhibits 13-1, 13-2, and 13-3**. Det. Gilvin identified **Exhibit 13-1** and **Exhibit 13-3** as photographs of persons other than Mr. Hurst and identified **Exhibit 13-2** as a photograph of Mr. Hurst.

Det. Gilvin then described the January 30, 2007 search, conducted pursuant to the first warrant. He stated that he participated in the search and noted that the officers did not find rings and other items that had been listed in the affidavit underlying the warrant.

Det. Gilvin then backed-up and reviewed the events of January 27, 2007, from the beginning. Det. Gilvin stated that the ACSD got a car description after bad checks were passed at a Wal-Mart and after a car fitting the same description tried to use a credit card at a drive-through teller. Det. Gilvin explained that the description was radioed out and the Clinton Police Department ("CPD") stopped the car in south Clinton. Det. Gilvin said that at the time he arrived at the scene of the stop he did not know who the car belonged to, and he noted that he did not help with the search of the car.

Det. Gilvin said he had only a brief interaction at the scene with Mr. Hurst, as he described earlier in his testimony, but Det. Gilvin said he spoke with Mr. Hurst later at the detention center and gave him a Coca Cola and a cigarette. Det. Gilvin denied ever telling Mr. Hurst that items had already been found at his house but noted that Mr. Hurst wanted his wife to avoid any charges. Det. Gilvin said that Mr. Hurst called his wife and told her to give anything he had given her to the ACSD. Det. Gilvin said officers later went and retrieved purses, shoes, and some costume jewelry from Mr. Hurst's wife. Det. Gilvin said that the call from Mr. Hurst to his wife was made in the officers' presence, but no officers spoke with Mr. Hurst's wife until they went to the Hurst residence. Det. Gilvin stated that he had personally gone to the Hurst home. He recalled that, at a later date,

Mr. Hurst's wife called saying there were more things at the home including bonds, which Mr. Hurst had not told the officers about. Det. Gilvin said that he went to collect these items, and they were eventually turned over to KPD.

Det. Gilvin also noted that he did not know where Mr. Hurst lived until he was later told. Det. Gilvin stated that he never called Mr. Hurst a liar during the interview at the detention center nor did he recall Mr. Hurst stating that he would only discuss the Knox County charges. Det. Gilvin remembered the interview lasting approximately 30-45 minutes but could not recall who was present. Det. Gilvin jotted notes, but he said the notes were not extensive and that he could not find them. Det. Gilvin confirmed that it was uncommon for an officer to not know where his notes are. Det. Gilvin explained that he may have shown his notes to other KPD or ACSD officers working on the case.

Det. Gilvin stated that he has lived in Anderson County since 1993 and is vaguely familiar with the Lake City area. Det. Gilvin testified that he had only been to the Defendant's home the one time, in order to execute the first search warrant. Det. Gilvin said he had always known the road on which the Defendant's home is located as "Bolin Road," but he explained that he did not have any specific information about the road. AUSA Stone presented Det. Gilvin with a photograph of the Defendant's home, which was admitted without objection as **Exhibit 11**. Det. Gilvin circled the right side of the house and noted that the house did not have a screened-in porch.

Finally, Det. Gilvin again confirmed that officers did not recover the items listed in the affidavit from the Defendant's residence. However he noted that other property was recovered from the Defendant's residence and was turned over to KPD and ACSD authorities to attempt to link it to thefts and burglaries in the area. Det. Gilvin estimated the number of items as being between five

and twenty-five.

On cross-examination, Det. Gilvin explained that the Wal-Mart and the drive-through ATM teller incidents had aroused suspicions of a vehicle fitting the same description with three suspects in it. Det. Gilvin said that prior to his arrival the suspects—Mr. Lee, Mr. Lawson, and Mr. Hurst—had taken their pawn ticket in to get the items which they were found with. The items included an inexpensive, fake diamond cluster ring, which Det. Gilvin said was different from the expensive cluster ring officers would later search the Sharp residence for. Det. Gilvin stated that when he arrived the suspects' vehicle was being searched and the suspects had already been put into patrol cars. Again, Det. Gilvin explained that he did not participate in the search. Det. Gilvin stated that he approached Mr. Hurst to ask about his whereabouts the night before and, at that time, Mr. Hurst produced his parole card.

Det. Gilvin said he concentrated on Mr. Hurst because he was already being interviewed by a sergeant. Det. Gilvin said he did not remember Mr. Hurst saying that he would only talk to officers from Knoxville, and Det. Gilvin said he did not tell Mr. Hurst that officers from Knoxville would be coming to talk to him. Det. Gilvin confirmed that Clinton officers advised Mr. Hurst of his constitutional rights and obtained consent to search from Mr. Hurst. Det. Gilvin said that he was aware Mr. Lawson was taken to different locations to recover stolen property, but Det. Gilvin did not participate. Det. Gilvin confirmed that he was also aware of the list of items and crimes that was produced from Mr. Lawson's trip with officers. Det. Gilvin said he believed Mr. Lawson left for the trip with officers after first being taken to the jail.

Det. Gilvin again reviewed the questioning of Mr. Hurst at the detention center. He confirmed that Mr. Hurst was advised of his rights. Det. Gilvin was not sure how Mr. Hurst's house

came up, but Det. Gilvin reiterated that Mr. Hurst revealed the information to prevent charges against his wife. Det. Gilvin explained that Mr. Hurst's call to his wife was not recorded because it was made on a line used by officers. Det. Gilvins said that he did not make specific notes during the conversation at the detention center and he could not recall if anyone else was in the room at the time of the call.

Det. Gilvin testified that he did not call Mr. Hurst a liar, but recalled that Mr. Hurst denied committing crimes in Anderson County and maintained that all the crimes had taken place in Knox County. Det. Gilvin confirmed that Anderson County authorities charged Mr. Hurst with a burglary in Anderson County, but it turned out the items in question were stolen in Knox County and the charges were dropped. Det. Gilvin admitted that Mr. Hurst had told the truth about not committing crimes in Anderson County. Det. Gilvin confirmed that two warrants stemming from the same incident had been issued, but both were dismissed because they were brought in the wrong county.

Looking at the affidavit and the first search warrant for the Defendant's residence, Det. Gilvin confirmed that he was the only person Mr. Hurst mentioned the Defendant's residence to, even though the warrant said "John David Hurst has advised officers." Det. Gilvin said he could not recall what the "four different locations in Anderson County," noted in the warrant, were. Det. Gilvin stated that at the time he may have had the locations written down, but as he recalled, he only went to one of the locations that Mr. Hurst had provided. Det. Gilvin recalled that at that location officers recovered a GPS and some tools that had been stolen. Det. Gilvin recalled that the one location he visited was one of the suspects' aunt's home, but he could not say which suspect. Det. Gilvin stated that the information about locations was given by Mr. Lee or Mr. Lawson and subsequently verified by Mr. Hurst. Det. Gilvin said he was not aware that Mr. Lawson also gave

information confessing to committing crimes that occurred while Mr. Hurst was in the penitentiary.

Looking again at the underlying affidavit, Attorney Harwell drew Det. Gilvin's attention to the statement that "Officers have recovered said items," referring to the items that were recovered at the four locations. Det. Gilvin stated that he could not say which officers this statement was referring to and speculated that it might be a combination of KPD, ACSD, and CPD officials. Det. Gilvin stated that "said items" referred to the GPS, stolen tools, and other items that had been found. Det. Gilvin confirmed that those items were not mentioned anywhere else in the affidavit. Det. Gilvin agreed that it was fair to say that he was generalizing about the information that was circulating in the ACSD at the time.

Det. Gilvin then addressed the directions in the affidavit and the warrant. Det. Gilvin stated that he had not been to "Boling/Bolin Road" at the time the affidavit was swore out; he stated the directions had been given to him by Detective Bowie and Lt. Braden. Det. Gilvin explained that he took the warrant to find the premises—the second house on the right after crossing the railroad tracks. Attorney Harwell presented Det. Gilvin with a tax map of the area, which Det. Gilvin confirmed to be a general representation of the area. This map was later admitted as **Exhibit 14** to the hearing. Det. Gilvin confirmed that there are two houses on the parcel of land, one of which is or looks like a trailer. Det. Gilvin stated that there is a metal gate at the front of the driveway onto the parcel and the mailbox next to the gate has the numbers "164." Det. Gilvin said that there are at least two mailboxes at the end of the driveway.

Det. Gilvin said that he searched through the first house trailer that one comes to on the drive way and looked through the repair shop/outbuilding. Neither of these buildings included a front porch. Det. Gilvin did not recall looking at the street signs around the home, but he noted that he

had never heard of a Boling Road.[2]

Attorney Harwell then asked Det. Gilvin about the recovered items he had previously described. Det. Gilvin clarified that the items, which he early estimated as being at most twenty-five items, were recovered from the Sharp residence.

Finally, Det. Gilvin again reviewed his conversations with Mr. Hurst. He stated that when he first approached Mr. Hurst in the pawn shop parking lot he asked Mr. Hurst where he had been the night before because the description of the suspects and vehicles had been the subject of an "all points bulletin." Det. Gilvin acknowledged that Mr. Hurst said he had been somewhere other than the location suggested by Det. Gilvin. Det. Gilvin did not recall Mr. Hurst saying anything about being at a young woman's apartment. With regard to the interview at the jail, Det. Gilvin stated that he did not use a tape recorder to record the interview, even though he acknowledged that officers are issued tape recorders for taking such statements. He did not believe the conference room in which the interview took place was equipped with recording equipment. Again, Det. Gilvin acknowledged that he could not find his notes, despite knowing how important they might be at this hearing.

Det. Gilvin was again questioned about obtaining the warrant on January 30, 2007. Det. Gilvin stated that he did not tell Judge Layton about Mr. Hurst's criminal history but did tell Judge Layton that Mr. Hurst was involved in the burglaries at issue. Det. Gilvin said he referenced Mr. Hurst in his affidavit, rather than Mr. Lee or Mr. Lawson, because Mr. Hurst had given him the information about the Defendant and his residence.

---

[2]Each witness who addressed the "Boling/Bolin" road issue was asked to spell the name of the road. The Court's spelling of the word reflects the way the witness spelled the word in their testimony.

On redirect, Det. Gilvin confirmed that when he said "officers," in the warrant issued on January 30, 2007, he meant himself. Det. Gilvin stated that while he did not remember the four locations on the date of the hearing, he did know the locations at the time he swore to the affidavit. Det. Gilvin stated that he shared that information with other officers. Det. Gilvin stated that Mr. Hurst would have had to identify the four locations to lead officers to them. Det. Gilvin stated that officers recovered stolen items from the locations, but could not recall which officers had recovered the items. Nor could he recall the specific items that were recovered from the locations. Det. Gilvin did recall that Lt. Braden and Det. Bowie were working on this case with him.

Det. Gilvin stated that two rings were pawned right before Mr. Lee, Mr. Lawson, and Mr. Hurst were stopped. He said that he personally saw the rings, which were inexpensive paste jewelry. AUSA Stone showed Det. Gilvin a photograph of jewelry, which Det. Gilvin recognized a signet ring in the photograph and vaguely recognized the cluster ring from the pawn shop but did not recognize the watch that was also pictured. This photograph was received as **Exhibit 15**.

On recross-examination, Attorney Harwell asked Det. Gilvin about the buildings on the Defendant's property. Det. Gilvin was presented with a photograph of a structure on the Defendant's property; the photograph was received into evidence without objection as **Exhibit 12**. Looking at the photograph, Det. Gilvin noted that the house-trailer seen in Exhibit 12 sits pretty fair back on the property. Det. Gilvin was unsure whether there was a house on the property closer to the road than the one shown in a photograph. Another photograph showing a structure on the Defendant's property was admitted into evidence, without objection, as **Exhibit 16**. Exhibit 16 was identified as showing a house closer to the road, while Exhibit 12 was identified as showing another residence farther back on the property.

On a second redirect-examination, Det. Gilvin confirmed that Exhibit 16 showed a dwelling that appeared to be a mobile home with a frame roof built over it. Det. Gilvin confirmed that it did not have brown siding or a basement. Det. Gilvin also noted that a metal gate at the entrance to the Sharp property can be seen in the same photograph and is the only way on and off of the Sharp property. Det. Gilvin said that from the prospective of the photograph, the Sharp residence is to the left and up a hill. Looking at Exhibit 12, Det. Gilvin confirmed that the structure shown was a mobile home with a metal roof but over it.

Finally on a second recross-examination, Det. Gilvin confirmed that the house pictured in the photograph marked as Exhibit 11 was the one searched and that, looking at the photograph, the dwellings shown in Exhibits 12 and 16 were to the right of that home. Det. Gilvin estimated that the dwelling in Exhibit 12 sits closer to the point from which the photograph was taken, and the dwelling in Exhibit 16 sits about one-hundred twenty-five yards further into the property.

**B. Lieutenant Ronnie Braden**

Lieutenant Ronnie Braden ("Lt. Braden") testified that he had been employed by the ACSD for approximately twenty years and had been a lieutenant for thirteen years. Lt. Braden stated that he supervises several departments in the ACSD including the drug unit and the detectives. He stated that in January 2007, he assisted the detectives but was more involved in the drug unit. Lt. Braden stated that he remembered the Defendant's case and remembered John Daniel Hurst. Lt. Braden explained that he assisted in attempts to recover property and came in while Det. Gilvin was interviewing Mr. Hurst. Lt. Braden noted that he signed the rights waiver executed by Mr. Hurst and remembered that the interview had been conducted in a small conference room at the detention center. Lt. Braden said he was only present in the conference room during the execution of the rights

waiver, but he stayed around the detention center during the interview and estimated that it lasted between fifteen and thirty minutes.

Lt. Braden stated that he assisted Det. Gilvin when he was getting the search warrant and recalled the information from Mr. Hurst about selling stolen property to the Defendant. Lt. Braden also remembered that property was found at four or five other locations: Andersonville, Claxton, Clinton City, and south Clinton. He noted that the lady at the Andersonville location was not home and officers had to go back to that location later. Lt. Braden testified that Det. Gilvin had told him the four locations he had gotten from Mr. Hurst. Lt. Braden recalled that he, Det. Gilvin, and Sgt. Linert, along with some other officers, went to the locations to recover the goods. Lt. Braden said he believed that he and Det. Gilvin went to all four locations, because they made a single trip, but was unsure if they all went back to the return visit to the Andersonville location, where the lady had not been home. Lt. Braden stated that, as he remembered it, he and the other officers recovered cameras, a GPS unit, a flat screen computer monitor, and some jewelry.

Lt. Braden participated in the execution of the search warrant at the Defendant's residence and recalled that officers were looking for a diamond horseshoe ring and a necklace or some other type of jewelry. He stated that none of the items found at the other locations matched the items that officers were looking for at the Defendant's residence.

Lt. Braden stated that he does not live in Anderson County, but he has worked in Anderson County for twenty years and is familiar with the area including Lake City. Lt. Braden noted that during the years prior to the execution he had been to the Defendant's residence somewhere between five and ten times. Lt. Braden stated he knew the Defendant and had dealt with him a time or two. Lt. Braden had gone to the Defendant's residence and talked with the Defendant about stolen

property. Lt. Braden stated that there was no possibility of him getting confused about its location. He stated that he knew where the house was and had always known the road as "Bolin." Lt. Braden noted that the street sign on the portion of the road that falls within Lake City had a "g" on it, but up until the sign on the portion of the road in the county was replaced recently, it had not had a "g," prior to being replaced. Lt. Braden acknowledged that both signs now spell the road B-o-l-i-n-g, but in January 2007, Lt. Braden stated that one of the signs would have spelled the road name B-o-l-i-n.

On cross-examination, Lt. Braden confirmed that in January 2007 he was the lieutenant supervising the drug unit. He stated that he did not directly supervise Det. Gilvin, but he was involved with the detectives' work. Lt. Braden stated that he was aware that a car was stopped in the parking lot of the South Clinton Pawn Shop around 4:00 p.m. on January 27, 2007. Lt. Braden said he went to the parking lot and when he arrived, he believed, the suspects had already been put into patrol cars. Lt. Braden said he did not look closely at who was in the patrol cars and he did not hear any questioning of the suspects. Lt. Braden testified that he remembered the suspects being separated, but he thought they were taken back to the detention center before any of them were taken to lead police to stolen property. Lt. Braden recalled that either Mr. Lee or Mr. Lawson went with officers to drive around and collect stolen goods but Mr. Hurst did not.

Lt. Braden stated that Mr. Hurst provided the information about the locations he went to, in Andersonville, Claxton, and Clinton City, because Lt. Braden was only involved in the investigation of Mr. Hurst. Lt. Braden stated that the ACSD did not have a policy of tape recording interviews, but noted that some detectives have recording devices which they bought themselves. Lt. Braden stated that it was not unusual for a suspect's interview not to be recorded. Lt. Braden stated that it was his expectation that notes about stolen property and locations where it could be recovered would

be kept until the case had been adjudicated.

Lt. Braden again stated that Mr. Hurst was interviewed in a conference room at the detention center and that he only witnessed the advising of rights and execution of the waiver. Lt. Braden said that he was not in the interview room when Det. Gilvin and Mr. Hurst discussed the locations where stolen property could be found. Lt. Braden said he could not testify to whether the information came from Mr. Lee, Mr. Lawson, or Mr. Hurst because he was not present at the time it was obtained.

Lt. Braden stated that he believed he was present when the search warrant for the Defendant's residence was executed on January 30, 2007. Lt. Braden stated that he thought officers recovered goods from the four locations in the search warrants both before and after the January 30, 2007, warrant execution. Lt. Braden thought that the jewelry was recovered before the execution of the search warrant, but he believed that the items from the lady who was not home may have only been recovered after the search warrant was executed.

## C. Detective Michael Harper

Detective Michael Harper ("Det. Harper") testified that he has been employed by the KPD as a criminal investigator in the property crimes unit since the summer of 2005. Det. Harper stated that he has been with the KPD as a law enforcement officer since 1999 and was employed as a transportation officer for six years prior to that. Det. Harper stated that in January 2007 he was investigating vehicle burglaries at bars in and around Knoxville. Det. Harper explained that he was informed that some men who may have been involved in the burglaries were under arrest in Anderson County and he went to Anderson County to interview them. Det. Harper said he spoke to Mr. Lawson and Mr. Lee on January 27, 2007, and returned on February 2, 2007, to interview Mr. Hurst.

15

Det. Harper said that the Defendant's name came up on January 27; he believed either Det. Gilvin or Det. Bowie told him about the information implicating the Defendant. Det. Harper's notes indicated that Detective Parker of the CPD also mentioned the Defendant when Det. Harper spoke to him a couple of days after the arrests. Det. Harper explained that Det. Bowie told him the Defendant was mentioned as a person that the three suspects had been selling or trading stolen property to. Det. Harper said that when he spoke to Det. Parker the search warrant had been executed on the Defendant's home and its execution was the subject of the conversation. Det. Harper said that, prior to speaking to Mr. Lee and Mr. Lawson, the Defendant's name had not been mentioned to him, and when he did speak to them, neither Mr. Lee nor Mr. Lawson mentioned the Defendant's name to him.

Det. Harper clarified that he spoke to Mr. Hurst on February 2, 2007. Det. Harper said that he brought up the Defendant's name and asked Mr. Hurst if he knew the Defendant. Det. Harper said that Mr. Hurst said he did not want to talk about the Defendant. Det. Harper said Mr. Hurst's exact words were "I don't want to talk about that." Det. Harper said his impression was that, while Mr. Hurst had been very cooperative in the interview, he did not want to discuss his association with the Defendant. Det. Harper stated that he did not push the issue after Mr. Hurst said he did not want to discuss it.

On cross-examination, Det. Harper confirmed that he was involved in the investigation on January 27, 2007, and had notes from his conversations with Mr. Lee and Mr. Lawson that day. Det. Harper stated that Mr. Lee and Mr. Lawson told him about car burglaries in Knox County and told him some of the places the items from the burglaries had gone; he said a number of the items were recovered that night. Det. Harper said he did not speak to Mr. Hurst that night but did pull police

reports to corroborate what Mr. Lee and Mr. Lawson had told him. Det. Harper stated that the Defendant's name was first mentioned to him on January 27, 2007, by either Det. Gilvin or Det. Bowie. Det. Harper said that on February 2, 2007, he had contact with both the ACSD and Mr. Hurst. Det. Harper confirmed that his notes from February 2, 2007, indicate that the search warrant of the Defendant's residence had already been executed. However, Det. Harper pointed out that his notes from earlier stages of the investigation include the note "Michael Sharp-fence." Det. Harper confirmed that this was information that had originated from Mr. Hurst not Mr. Lee or Mr. Lawson.

Det. Harper explained that he eventually spoke to Mr. Hurst twice and Mr. Hurst admitted to committing some of the crimes Mr. Lawson had implicated him in, but he denied others. Det. Harper stated that he checked into some of the crimes Mr. Lawson implicated Mr. Hurst in and they had taken place while Mr. Hurst was in the penitentiary. Det. Harper said that Mr. Hurst was very cooperative and did not deny being involved in many of the offenses that took place in Knox County. Det. Harper confirmed that Mr. Hurst eventually pled guilty to thirteen offenses in Knox County and received seven additional years in prison.

Det. Harper said that he was unsure whether Mr. Hurst knew at the time of his interview with Det. Harper that officers had executed a search warrant on the Defendant's residence. Det. Harper said he did not mention this fact to Mr. Hurst. When asked whether he inquired about the relationship between Mr. Hurst's wife and the Defendant's wife, Det. Harper replied that he was certain after Mr. Hurst told him that he did not want to talk about the Defendant neither the Defendant nor his wife came up again. Det. Harper said he knew that officers from the ACSD had spoken to Mr. Hurst's wife, but Det. Harper did not discuss Mr. Hurst's wife with him.

On redirect-examination, Det. Harper said that he spoke with Det. Bowie in person on January 27, 2007. Det. Harper stated that he arrived in Anderson County at approximately ten in the evening and spoke with Mr. Lee and Mr. Lawson around midnight on the night of the 27th and morning of the 28th. Det. Harper stated that information summarized in his notes as "found purses, brown fur, at home of Hurst. May have stuff." was likely supplied by Det. Bowie or Det. Gilvin, who were investigating other leads simultaneously.

## D.     Detective Danny Bowie

Detective Danny Bowie ("Det. Bowie") testified that he has been employed by the ACSD for fifteen years and has been a law enforcement officer for seventeen years in total. Det. Bowie stated that he was a detective with the ACSD during both January and August of 2007. Det. Bowie confirmed that in August 2007 he requested a search warrant for the Defendant's residence. Det. Bowie explained that he had been to the Defendant's residence several times before. Det. Bowie explained that in 2002 he assisted Tennessee Bureau of Investigation ("TBI") Agent Mark Irwin with an undercover narcotics investigation, and as part of assisting, Det. Bowie monitored controlled transactions that were made at the Defendant's residence. Det. Bowie stated that the Sharp residence is located at "164 Bolin Road." Det. Bowie stated that he had gone to the Defendant's residence at least twice to recover stolen property, once for a handgun and once for a motorcycle. Det. Bowie recalled that both of these items were retrieved from the Defendant personally.

Det. Bowie testified that he also went back to assist Det. Gilvin in executing the search warrants issued for the Defendant's residence in January and August of 2007. Det. Bowie identified the Defendant's residence as the structure on the right side of the photograph marked as Exhibit 11. Det. Bowie also added that he executed a search warrant at the Sharp residence in 2002 and had been

to the residence on several occasions. Looking at Exhibit 11, on the right hand side of the structure, as it is viewed in the photograph, Det. Bowie recalled that there used to be a screened-in porch but it has since been modified to be actual, additional living space.

Turning to the search warrant dated August 28, 2007, Det. Bowie stated that the only inaccuracy in the affidavit for the warrant was the description of the screened-in porch. Det. Bowie confirmed that he was the executing officer and reiterated that he had been to the residence at least five times before. The search warrant was received into evidence as **Exhibit 2**. Det. Bowie explained that the August 28, 2007, warrant was given to search for narcotics, proceeds from narcotics sales, and any documents relating to the proceeds of narcotics sales. Det. Bowie explained that on August 28, 2007, TBI Agent Teresa Woodward, while working undercover, had driven a confidential informant to the Defendant's residence to purchase Oxycontin. Based upon the completion of that purchase, Det. Bowie requested a search warrant for the Defendant's residence.

Det. Bowie explained that during the execution of the warrant officers recovered drivers' licenses from the Defendant and his wife Leslie Sharp and took photographs of those licenses. The photograph of these drivers' licenses was admitted into evidence as **Sealed Exhibit 5**. Det. Bowie confirmed that the addresses on the licenses were both "164 Bolin Road." Det. Bowie also stated that he found documents from a pharmacy with the Defendant's wife's maiden name, Leslie Danielle Burge, which listed her address as "164 Bolin Road." A photograph of the pharmacy documents was admitted into evidence as **Sealed Exhibit 6**.

Det. Bowie testified that in October 2007 he asked the Defendant for consent to search his residence, which the Defendant gave. Det. Bowie confirmed that he completed a consent to search form that contains both the Defendant and witness signatures. A copy of the consent form was admitted into evidence as **Exhibit 7**. Det. Bowie stated that he wrote the Defendant's address as "164 Bolin Road," on the consent form, but he asked the Defendant to confirm that it was correct. The Defendant said the address was correct.

Det. Bowie testified that in preparation for the hearing he pulled the Defendant's prison booking records, which list the Defendant's address as "164 Bolin Road." Det. Bowie said that these records are based upon the information prison officials receive from the inmates at the time they are processed and received at the prison. Copies of these records were admitted into evidence as **Exhibit 8**. In preparation for the hearing, Det. Bowie also obtained a certified copy of a portion of the county 911 rolls, which list all the addresses in Anderson County. Det. Bowie confirmed that the certified copy listed the addresses on "Bolin" Road, including the Defendant's. The certified copy was admitted into evidence as **Exhibit 9**. Det. Bowie noted that he was not aware of any road in Anderson County known as "Boling" road. Det. Bowie also confirmed that in preparation for the hearing, he searched the website Mapquest for "164 Boling Road." Mapquest responded that there were no matches, but there was a similar location in Lake City. Det. Bowie stated that when he entered "164 Bolin Road," Mapquest responded with a map accurately portraying the location of the Defendant's home. The printed search results were admitted into evidence as **Exhibit 10**.

Looking again at the photograph that was admitted as Exhibit 16, Det. Bowie stated that the Defendant's residence would be to the left in the background. Det. Bowie was not aware of anyone living in the structure in the right foreground of the photograph. Det. Bowie stated that this structure,

which he believed was a mobile home, was not searched on January 27, 2007. Det. Bowie confirmed that he could have described how to get to the place to be searched. Looking at the photograph marked as Exhibit 12, Det. Bowie confirmed that the structure was on the Defendant's property also but was not a place searched by officers while executing the search warrants. Det. Bowie identified the structure as a mobile home with a tin roof built over it. Det. Bowie again stated that if he wanted to search this structure he would have been able to give a description and directions directing officers to this structure. Det. Bowie said there was no chance he would mistakenly search this structure instead of the Defendant's residence.

On cross-examination, Det. Bowie confirmed that the directions given in his affidavit instruct the reader to turn left after the Exxon station. Det. Bowie said he believed there was only one Exxon station on Lake City Highway. Det. Bowie gave the directions for getting to the Defendant's residence and stated that he was unsure whether there was a street sign near the Defendant's property at the time. Det. Bowie stated that if the signs were at the corners nearby at the time, he would have passed them. Det. Bowie said he was not aware that another house on the Defendant's property had burned about a year before the events in question at the hearing. Det. Bowie stated that he had only ever known the Defendant to live in one house and that was the house that he and the other officers searched. Det. Bowie confirmed that the house he knew Michael Sharp to live in was the house that he mistakenly remembered as still having a screened-in porch. Det. Bowie stated that he did not know of any other homes that had brown siding like that on the Defendant's residence  on the road that the Defendant's property is located on.

Det. Bowie testified that he was not involved in the interviews or the stop on January 27, 2007, and was only involved in search the January 30, 2007. Det. Bowie confirmed that he did

participate in obtaining a warrant on August 28, 2007, from a juvenile court judge. Det. Bowie again stated that the warrant, which he obtained at approximately 4:21 p.m.[3] on August 28, stemmed from a controlled purchase by Agent Woodward earlier that same day. Det. Bowie stated that based upon the purchase officers obtained a warrant to search the Defendant's residence for drugs, but he admitted that the search warrants yielded the firearms which underlie the charges in this case. Det. Bowie explained that when the officers were looking for narcotics they found a handgun under a dresser. Det. Bowie stated that he knew, at the time, that the Defendant was a convicted felon but he also rechecked to make sure that the Defendant was a felon. Det. Bowie stated that the handgun and two other long guns were found pursuant to the search warrant issued August 28.

Det. Bowie explained that a district attorney came out and observed the items that were found at the Defendant's residence, and he and the district attorney obtained another search warrant for the Defendant's residence, which is the warrant dated 10:54 a.m. on August 29, 2007. Det. Bowie confirmed that the August 29 warrant used the same directions and description as the August 28 warrant. Det. Bowie confirmed that the facts stated as grounds for probable cause in the warrant issued on August 29, 2007, included the number of vehicles, ATVs, motorcycles, and lawn equipment, which were not typical for personal or residential use. The facts also stated that officers observed a vehicle with an altered vehicle identification number.

Det. Bowie clarified that the search warrant was issued at 4:25 p.m. on August 28, 2007, but that warrant was not served until the morning of August 29, 2007. After searching the Defendant's residence a second warrant was obtained at 11:05 a.m. on August 29, 2007, relying on information

---

[3]Det. Bowie testified that he received the warrant at 4:21 p.m. More specifically, Det. Bowie signed that he had completed preparation of the warrant at 4:21 p.m. Judge Meldrum endorsed the warrant at 4:25 p.m.

obtained from the earlier search. The warrant dated August 28, 2007, at 4:25 p.m., was admitted into evidence as Exhibit 2, and the warrant dated August 29, 2007, at 11:05 a.m., was admitted into evidence as **Exhibit 17**.

Again, Det. Bowie stated that the three firearms, a handgun and two long guns, were located during the execution of the search warrant which was issued on the evening of August 28 but not executed until the morning of August 29. Three photographs of the firearms—one of the handgun hidden under a dresser, one of the handgun, and one of the two long guns—were admitted into evidence as a collective exhibit, **Exhibit 18**. Det. Bowie testified that the handgun was found by Detective Roger Day ("Det. Day") in the Defendant's bedroom, which was on the top level of the Sharp residence. Det. Bowie confirmed that when the search warrant dated August 28, 2007, was executed on August 29, 2007, the Defendant was found in his bedroom and told Det. Day that he had been sleeping there. Det. Bowie confirmed that in the search warrant issued at 11:05 a.m. on August 29, 2007, officers sought permission to search for firearms, financial records, and other items anywhere on the Defendant's property.

Det. Bowie confirmed that he took a set of keys from the Defendant to facilitate a consent search at the residence of Mack Sharp, the Defendant's father. Det. Bowie stated that officers talked to Mack Sharp across the street at his home, but Mack Sharp did not have the key to the gun cabinet located at his home. Det. Bowie recalled that Sargeant Linert was present when he talked to Mack Sharp, but he could not recall which man went back to the Defendant's residence to get the key from him. Det. Bowie stated that someone went to get the keys from the Defendant, and thereafter,

officers conducted a consent search.[4]

Turning back to the search of the Defendant's residence on January 30, 2007, Det. Bowie testified that he did not actually conduct the search. Instead he found out that guns were found during the search and told the officers who had found the guns that the Defendant was a convicted felon. Det. Bowie said he also notified Agent Wagooner with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, who instructed Det. Bowie to seize the weapons. Det. Bowie could not recall making any notes about the search on January 30, 2007.

On redirect-examination, Det. Bowie stated that Leslie Sharp was the Defendant's wife and confirmed that at the time of the controlled buy on August 28, 2007, he was aware that Leslie Sharp lived in the same residence as the Defendant. As to the VIN number, Det. Bowie could not recall specifically, but he believed that the VIN number was in plain view. He noted that VIN numbers are supposed to be on the left front dashboard. Det. Bowie said he had no knowledge of whether the Defendant voluntarily gave the keys to the gun cabinet to officers, and on recross-examination, Det. Bowie confirmed that the keys were given at the time the Defendant's home was being searched.

E.    **John Daniel Hurst**

John Daniel Hurst ("Mr. Hurst") stated that he has been in custody at the Southeastern Tennessee Regional Correctional Facility since January 26, 2007. Mr. Hurst stated that at the time of his arrest he, Mr. Lee, and Mr. Lawson had pulled into the parking lot of the South Clinton Pawn

---

[4]Attorney Harwell conducted additional questioning on the issue of the consent given by Mack Sharp. [Doc. 54 at 72-77]. However, the Government objected to this questioning and argued that it was irrelevant because the Defendant's motions did not argue that Mack Sharp's consent was invalid and because the Defendant lacked standing to argue that the consent was invalid. The Court sustained this objection and gave the Defendant leave to address this issue in his supplemental brief. [Doc. 54 at 76].

Shop.  Mr. Hurst stated that the three were at the pawn shop so that Mr. Lee could pawn some jewelry–a ring and other items.  Mr. Hurst said that it was around lunch time or a little after when the three were at the pawn shop.

Mr. Hurst stated that the night before his arrest he was with Mr. Lee at Mr. Lee's girlfriend Christy Seiber's apartment in north Clinton.  Mr. Hurst recalled that the apartment is in a brick apartment building located behind a gas station called "The Shortstop."  Mr. Hurst stated that he and Mr. Lee left the apartment at about 2:30 or 3:00 a.m., but he stated that they did not leave the apartment at any other time.  Mr. Hurst stated that he did not go to Lake City that night.  Mr. Hurst testified that he did not know a man named Michael Sharp and that he did not go to the home of any persons that he did not know the name of that night.  Mr. Hurst also stated that he did not know where the Defendant lives.

Mr. Hurst explained that at the time of his arrest he was in the driver's seat of a Dodge Neon that belonged to his wife.  Mr. Hurst stated that he remembered the names of the officers who stopped him and the others–Sargeant Bailey ("Sgt. Bailey") and Officer Jason Lawson ("Officer Lawson")–because it was a coincidence that Officer Lawson and Mr. Lawson had the same name.  Mr. Hurst stated that, after the car was stopped, he, Mr. Lawson, and Mr. Lee remained in the car for a moment, and then a detective arrived at the scene and the three were split up.  Mr. Hurst explained that he and Mr. Lee were put into Sgt. Bailey's vehicle and Mr. Lawson was put into Officer Lawson's vehicle.  Mr. Hurst stated that he did not see Mr. Lawson anymore after the three were put into different vehicles.  Mr. Hurst estimated that he, Mr. Lee, and Mr. Lawson were together in the pawn shop parking lot for two and a half or three hours before they were split up.

Mr. Hurst recalled talking to, what he described as, a heavyset detective, who came up and

went through the car Mr. Hurst had been driving. Mr. Hurst stated that he did not have a conversation with the detective at that time. Mr. Hurst recalled that the only officer he had contact with was Sgt. Bailey, who let him sit in the back seat and smoke a cigarette. Mr. Hurst stated that he showed Sgt. Bailey his parole card. Mr. Hurst explained that after he was placed in the patrol car he was immediately taken to the Anderson County detention center.

Mr. Hurst explained that when he arrived at the detention center he was put into a holding cell, and after three or four hours, he was taken to another small room. Mr. Hurst stated that in this room he met Det. Gilvin. Mr. Hurst said that he did not remember being advised of his rights, nor did he recall anyone other than Det. Gilvin being in the room. Mr. Hurst said that Det. Gilvin accused him of being involved in car thefts and burglaries in Anderson County. Mr. Hurst said that he told Det. Gilvin that he had not committed any crimes in Anderson County but that the authorities in Knoxville probably wanted him. Mr. Hurst said that Det. Gilvin called him a liar and told him that officers had already been to his house and recovered stolen goods.

Mr. Hurst stated that he remembered telling Det. Gilvin that his wife was not involved in any of the crimes. Mr. Hurst said that after his conversation with Det. Gilvin he was taken back to a pod. Mr. Hurst said that he did not tell Det. Gilvin about any places in Anderson County where he could find stolen goods. Mr. Hurst stated that he did not say anything to Det. Gilvin about the Defendant, Michael Sharp, and did not know the Defendant. Mr. Hurst said he believed his wife and the Defendant's wife knew each other. Mr. Hurst remarked that his wife had a pill problem and that is likely how she knew the Defendant's wife. Mr. Hurst recalled that Det. Gilvin was making notes during the interview. Mr. Hurst stated that the interview was not recorded, and remembered asking about a lawyer, to which Det. Gilvin replied, "Well, this is man-to-man talk." Mr. Hurst again said

he did not tell Det. Gilvin any place where officers could find stolen goods.

Mr. Hurst said he had the opportunity to talk with Mr. Lee while they were at the detention center because they were in the same pod. Mr. Hurst said he believed Mr. Lee was taken out by officers after Mr. Hurst talked to him. Mr. Hurst said that when he arrived at the detention center, one of the staff there was familiar with Mr. Hurst's family and warned Mr. Hurst that he should cooperate because Mr. Lawson was taking officers around collecting goods and informing officers.[5] Mr. Hurst said he did not cooperate with Anderson County officers and maintained that he would only speak with detectives from Knox County.

Mr. Hurst recalled speaking with Det. Harper from Knoxville about three days after his arrest. Mr. Hurst said that Det. Harper had a list of places that he went over with Mr. Hurst. Mr. Hurst said that he admitted to Det. Harper the crimes he had committed in Knox County and was charged with twenty-eight offenses in Knox County. Mr. Hurst explained that he was also charged with two crimes in Anderson County but the charges were later dismissed because the crimes occurred in Knox County. Mr. Hurst believed that he was convicted of twenty-eight offenses and stated that he was sentenced to seven years imprisonment, which he is currently serving.

Mr. Hurst stated that he is now aware that Det. Gilvin used his name in a search warrant, and agreed that Attorney Harwell had shown him the search warrant. Mr. Hurst said the portion of Det. Gilvin's affidavit that said Mr. Hurst gave Det. Gilvin information about where stolen goods could be found was not true.

---

[5] Mr. Hurst stated that he was urged to "corroborate," but his further explanation of his answer made it clear that he was urged to cooperate with authorities.

On cross-examination, Mr. Hurst acknowledged that he was expected to testify truthfully at the hearing but admitted that he had not always been honest and had committed numerous crimes of dishonesty. Mr. Hurst stated that at the time he committed the crimes he was a dishonest person, but he explained that he has completed drug rehabilitation and is trying to be a new man. Mr. Hurst stated that the crimes he committed were all car burglaries, and he acknowledged that he had a long rap sheet of crimes committed in Knox County, Oak Ridge, Athens, and Anderson County. Mr. Hurst stated that he is twenty-nine years old and he started stealing when he was fifteen or sixteen because he was addicted to drugs. Mr. Hurst stated that he initially was addicted to marijuana but later turned to opiates–pain pills, Oxycontin, Dilaudid. Mr. Hurst estimated that he had committed hundreds of thefts over the years. Mr. Hurst confirmed that he was stealing the day he was caught and sent to the penitentiary, and he stated that he had served federal time for committing car burglaries in a national park.

Mr. Hurst stated that his wife, Ashley Hurst, had a pill problem, like Leslie Sharp, the Defendant's wife. Mr. Hurst confirmed that Ashley Hurst and Leslie Sharp knew each other, but Mr. Hurst said that at the time of Det. Gilvin's affidavit he had never heard the Defendant's name and did not know the Defendant's wife. Mr. Hurst said that he and his wife lived separate lives, were just together for pills, and are now in the process of divorcing. Mr. Hurst said that his wife would talk about a "Leslie," but he had never met Leslie Sharp. Mr. Hurst said that his wife never mentioned the Defendant's name. Mr. Hurst said he did not deal with the Defendant because Mr. Hurst was from Knoxville and the Defendant was from somewhere in Anderson County. Mr. Hurst said that the Defendant was not someone he "ran around with." Mr. Hurst said he never would have met the Defendant because at the time Mr. Hurst was highly addicted to pain pills.

Mr. Hurst recalled Det. Harper coming to talk to him and asking about the Defendant. Mr. Hurst denied saying that he did not want to talk about the Defendant. Mr. Hurst maintained that he told Det. Harper that he did not know the Defendant and that he had not sold stolen goods to the Defendant. Mr. Hurst stated that he fenced his stolen goods in Knoxville, for example, to an individual named Jason Hahn, to Shylock's Pawn, and to Charlie's Super Pawn. Mr. Hurst said he had also traded some of the goods to JoAnn and Dennis Owens, Oxycontin dealers at the Lake City fair grounds, and Frankie McMahan in Clinton. Mr. Hurst also noted that he would sell stolen gift cards to certain family members at half price.

Mr. Hurst again admitted that his wife and the Defendant's wife would take pills together. Mr. Hurst said that his wife would tell him who she had been with. Mr. Hurst then admitted that he knew of the Defendant but did not know what he looked like, where he lived, or any other details about him. Mr. Hurst said that if he had known the Defendant he would have fenced items to him, but he never asked his wife about the Defendant. Mr. Hurst again stated that he told Det. Harper he did not know the Defendant and Det. Harper did not mention the Defendant's name again. Mr. Hurst emphasized that he had cooperated with the Knoxville police and stated that, if Det. Harper got the impression that Mr. Hurst knew the Defendant, he was mistaken.

Turning to the night Mr. Hurst was picked up, Mr. Hurst stated that he could not remember whether Det. Gilvin advised him of his rights prior to questioning. AUSA Stone presented Mr. Hurst with a rights waiver, which Mr. Hurst confirmed he had signed on January 27, 2007, at 5:15 p.m. Mr. Hurst maintained that he was taken into custody on January 26, 2007, and confirmed that in the document he waived his right to an attorney because he did not believe he needed one. The rights waiver was admitted into evidence as **Exhibit 19**.

Mr. Hurst said that his co-conspirator/partner sold stolen goods to Rhonda Daniels in Andersonville.[6] Mr. Hurst said that Det. Gilvin probably obtained this information from Mr. Lee or Mr. Lawson because he talked to all three of the co-conspirators/partners. Mr. Hurst said that Det. Gilvin asked if Mr. Hurst had stolen any property near the VFW,[7] but Mr. Hurst denied doing so. Mr. Hurst also denied that Det. Gilvin asked him about a "Steve Faust" on Lobster Lane in a trailer park. Mr. Hurst remarked that Det. Gilvin had brought up a lot of places but he could not recall all of them. Mr. Hurst stated that Det. Gilvin mentioned Ms. Seiber to him, but Mr. Hurst did not recall Det. Gilvin bringing up a "Jason Samone" who lived on Hill Valley. Mr. Hurst also did not recall speaking to Det. Gilvin about "Matthew Jones" but noted that he had a friend named Matthew Gribble.

Mr. Hurst denied that he told Det. Gilvin that he had taken a stolen chain necklace, men's diamond cluster ring, and a diamond horseshoe ring to the Defendant. Mr. Hurst stated that those items were the items that Mr. Lee had just pawned when officers approached the suspects. When AUSA Stone stated that different jewelry was pawned, not same jewelry that Det. Gilvin described, Mr. Hurst said he did not know about the jewelry then, but Mr. Hurst maintained that he did not tell Det. Gilvin about taking stolen property to the Defendant. Again, Mr. Hurst said he did not tell Det. Gilvin about places in Anderson County where he had gotten rid of stolen property.

---

[6]At this point, AUSA began questioning Mr. Hurst about information contained in Det. Gilvin's notes, which AUSA Stone later informed the Court he had found during the hearing. Thus, the names and questions appear to be somewhat random, as the previous testimony at the hearing had not contained or addressed this information.

[7]At the hearing Mr. Hurst and AUSA Stone simply referred to the "VFW." This appears to be a Veterans of Foreign Wars outpost and meeting place in Anderson County.

Mr. Hurst estimated that his interview with Det. Gilvin lasted about an hour because Det. Gilvin went through a list of old crimes that he wanted to know if Mr. Hurst had committed. Mr. Hurst again stated that Det. Gilvin told Mr. Hurst that officers had gone to his house and recovered stolen goods, but Mr. Hurst said he did not know how officers knew where he lived. Mr. Hurst said that he did not call his wife and instruct her to turn over goods until later after officers from Knox County had gotten involved in the investigation. Mr. Hurst denied that the call to his wife took place in the conference room while Det. Gilvin was present. Mr. Hurst maintained that he called his wife once the Knox County authorities had come to Anderson County. Mr. Hurst recalled using the phone near the booking area of the detention center to make the phone call.

Mr. Hurst explained that he spoke to Officer Lawson and Sgt. Bailey at the original scene and then spoke to Det. Gilvin when he was taken to the detention center. Mr. Hurst also said that he spoke to a detective from Knox County immediately after he spoke to Det. Gilvin, but Mr. Hurst could not remember the detective's name. Mr. Hurst said that three or four hours later he made the call to his wife from the booking area and a few days later he spoke to Det. Harper and Officer Abbot. Mr. Hurst said that by the time he spoke to Det. Harper and Officer Abbot, the officers already had the stolen items from his wife. Mr. Hurst said that the only phone call he made to his wife was made on his own after he had been interviewed by Det. Gilvin. Mr. Hurst said that his wife called the officers from the ACSD to come pick up the items. Mr. Hurst said that, as far as he knew, his wife just turned over purses; he did not recall any items being in the attic until he was reminded about bonds that had been in the attic. Mr. Hurst said his wife knew everything that he had done and he did not want her to be charged with any crime and lose custody of her son. Mr. Hurst stated that he did not tell Det. Gilvin about the goods. Instead, he said that Det. Harper and Officer Abbott

brought the items in and the three went through the items. Mr. Hurst maintained that he did not discuss his crimes with Det. Gilvin. Mr. Hurst stated that he spent the hour in the interview listening to and denying Det. Gilvin's allegations.

Mr. Hurst said that he did not mention the relationship between his wife and the Defendant's wife in the affidavit he submitted to the Court because the main question asked of him was whether he knew the Defendant, which he did not. Mr. Hurst acknowledged that the information contained in the affidavit contradicted Det. Gilvin's testimony, and one of the two was lying. Mr. Hurst said he did not think it was important to bring up the relationship between the wives. Mr. Hurst stated that he does not know the Defendant, but clarified that he knew that the Defendant's wife hung out with his wife, even though Mr. Hurst had never met the Defendant and did not know where he lived. Mr. Hurst then admitted that he had heard the Defendant's name but maintained that he did not know where the Defendant lived except that he lived in Anderson County. Mr. Hurst said that he did not mention his knowledge of the Defendant's name, home, or wife in his affidavit because he was not asked about that information. Mr. Hurst said that when Attorney Harwell asked about the Defendant in preparing the affidavit Mr. Hurst told him that he did not know the Defendant. Mr. Hurst said he also told Det. Harper that he did not know the Defendant.

Finally, Mr. Hurst confirmed that he used to live off of Wolf Valley Road in Anderson County. Mr. Hurst stated that when the events in question happened he was living in Lake City in Anderson County, but he did not live there long. Mr. Hurst recalled that his address in Lake City was 508 7th Street, apartment 9.[8]

---

[8] At the conclusion of Mr. Hurst's testimony, the Defendant attempted to submit an affidavit from Mr. Lee into evidence. However, without a showing of unavailability on the part of Mr. Lee or a showing that the affidavit would not be duplicative, the Court declined to receive the affidavit into evidence. The

**F.      Detective Joe Gilvin (Continued)**

After the Government located what it believed to be Det. Gilvin's notes from his interview with Mr. Hurst, Det. Gilvin testified a second time.  AUSA Stone presented Det. Gilvin with a copy of a document that Det. Gilvin identified as the notes he took when interviewing Mr. Hurst, Mr. Lee, and Mr. Lawson.  Det. Gilvin stated that the third page of the document contained the notes he took when he interviewed Mr. Hurst.  Det. Gilvin stated that the first two pages did not have information from Mr. Hurst.  Det. Gilvin said that the document was originally all connected and was a portion of his case log.  However, Det. Gilvin noted that he did not compose the last page and again stated that all his notes from his interview with Mr. Hurst were on the third page. Pages one, two, and four were admitted into evidence as **Exhibit 20**.  Page three, the only page with information pertinent to the interview with Mr. Hurst, was admitted into evidence as **Exhibit 21**.

Det. Gilvin examined the notes and stated that the notes were taken on Saturday January 27, 2007, at 1:00 a.m.  Det. Gilvin confirmed that he made a notation about a thick, gold herringbone chain.  Det. Gilvin confirmed that his notes also indicated that there was a four wheeler that was being kept at the Defendant's father's house.  The notes also mentioned two dinner rings–a man's cluster ring and a horseshoe diamond ring.  Det. Gilvin also made a note about an individual named "David Jarrell," a person whom Mr. Hurst said was using stolen credit cards to buy building materials at Home Depot for his home on New Henderson Road.  Det. Gilvin could not remember what his notation about two twenty inch Magnavox televisions was a reference to.  Det. Gilvin also could not recall why he made a notation about Mr. Lawson's aunt or what Mr. Hurst might have said

---

Court reasoned that absent compelling circumstances the Court would not allow an affidavit to substitute for testimony.

in connection to her. Det. Gilvin could not recall what the reference to a "Joe" in his notes meant. Det. Gilvin believed that the note about two or three storage sheds was about the Defendant having storage sheds in his yard, but Det. Gilvin admitted that the Defendant's name was not written near that note. Det. Gilvin could not recall why the number seven and the number nine were written above the "Anderson County Detention Facility" heading printed upon the paper.

On cross-examination, Det. Gilvin stated that the notation that the notes were taken at 1:00 a.m. on Saturday was meant to indicate that these notes were made while talking to Mr. Hurst. Det. Gilvin said that he did not recall asking Mr. Lee or Mr. Lawson about the Defendant. Det. Gilvin then said that he believed that the notation about 1:00 a.m. on Saturday was the time that Mr. Hurst had taken the jewelry to the Defendant's. Det. Gilvin said he did not ask Mr. Lee or Mr. Lawson about where they were on Saturday at 1:00 a.m. Det. Gilvin confirmed that he interviewed Mr. Hurst the same day that he was arrested. Det. Gilvin agreed that on Saturday, January 27, 2007, Mr. Hurst would have gone to the Defendant's house at 1:00 a.m, would have been arrested at the pawn shop somewhere between 2:00 and 4:00 p.m., and then had the interview at the detention center.

Det. Gilvin stated he was sure that Mr. Hurst gave him the information about the gold chain and the two dinner rings. Det. Gilvin said that he did not talk to Mr. Lee or Mr. Lawson about either of the gold chain or the rings. Det. Gilvin said he was aware that a cluster ring was pawned, but he said that it was not the same cluster ring that he was looking for. Again, Det. Gilvin explained the notation about "David Jarrell." Det. Gilvin said that he did not remember what the notations about "Smitty Joe" and storage sheds or beds were about. Det. Gilvin admitted that he did not make a note about the Defendant and Oxycontin. Det. Gilvin said he did not know why he made a note about the rings and chain, but did not mention where Oxycontin might be found. Det. Gilvin said that he did

not know of any other notes he had made in the interview.

**G.     Pretrial Services Officer Carol Cavin**

Carol Cavin ("Ms. Cavin") testified that she is a Pretrial Services Officer and Probation Officer in the Eastern District of Tennessee.  Ms. Cavin confirmed that she prepared a pretrial services report in this case on or around October 2, 2007.  Ms. Cavin stated that she met with the Defendant to prepare the report.  Ms. Cavin confirmed that in preparing a pretrial services report she always asks a defendant's address and that she did so in this case.  Ms. Cavin said that the Defendant gave her the address 164 Bolin Road, Lake City, Tennessee 37769.  Ms. Cavin said that she is not from Lake City, but she explained that she is from Oak Ridge in Anderson County and has previously worked in Clinton for fourteen years.  Ms. Cavin stated that she did not have any independent knowledge of Bolin Road and that the information she had came from the Defendant.

On cross-examination, Ms. Cavin could not remember whether she or the Defendant spelled the street name.  Ms. Cavin stated that it is part of her job to go out and view the residences in which Defendant live, but she said that in this case the Defendant's supervision was transferred to Joe Cuccia ("Mr. Cuccia"), another Pretrial Services Officer, who did the home visit.  Mr. Cuccia's only note was that the address had been verified.  Ms. Cavin said she did not check on the deed for the Defendant's property.  Ms. Cavin stated that the Defendant consistently uses "Bolin" as the street name when he fills out the sheets required to verify his visits to the Pretrial Services Office.

## II. FINDINGS OF FACT[9]

Based upon the testimony at hearing, the parties' memoranda, and the Court's review of the exhibits to the hearing, the Court finds the following facts:

On January 27, 2007, officers from the ACSD and the CPD were advised to be on the look-out for a vehicle containing three suspects, which may have been involved in passing bad checks at a local Wal-mart and attempting to use a stolen credit card at an ATM. Officers from the CPD detained a vehicle at the South Clinton Pawn Shop. Mr. Hurst, Mr. Lee, and Mr. Lawson had been riding in this automobile. Mr. Hurst, Mr. Lee, and Mr. Lawson were informed of their <u>Miranda</u> rights and placed in police cruisers, and officers, from both the ACSD and CPD, conversed with the suspects regarding the suspected crimes and other crimes they might have committed. Specifically, Sgt. Bailey discussed these matters with the Defendant.

At approximately 4:00 p.m., Det. Gilvin arrived at the pawn shop. Det. Gilvin spoke with Mr. Hurst at the scene and asked, among other things, where Mr. Hurst had been the night before. Det. Gilvin and Mr. Hurst's encounter at the pawn shop was brief, but Det. Gilvin and Mr. Hurst had a second interview at the Anderson County Detention Center later on the evening of January 27, 2007. Prior to the interview, Mr. Hurst was advised of his <u>Miranda</u> rights and executed a waiver of these rights. Lt. Braden was present when the Defendant was advised of his rights and waived his rights, but Lt. Braden was not present for the remainder of the interview. During the interview, Det. Gilvin and Mr. Hurst discussed the thefts that Mr. Hurst, Mr. Lee, and Mr. Lawson had committed

---

[9]Because Mr. Hurst's testimony contradicted the testimony of Det. Gilvin and, on some points, the other officers who testified at the hearing, the Court has made credibility determinations as to the witnesses and has discounted portions of the testimony given at the hearing accordingly. The specific credibility determinations and the Court's reasoning for these determinations will be discussed in the analysis portion of this report and recommendation.

during the previous months. However, Mr. Hurst maintained that he had not committed any crimes in Anderson County and that he committed thefts in Knoxville or Knox County.

Nonetheless, Mr. Hurst identified a number of locations at which goods that had been stolen could be found. The locations included four locations in Anderson County that were later referenced in the affidavit underlying the warrant dated January 30, 2007. Mr. Hurst also identified the Defendant as a person to whom he had sold or traded stolen property to, and stated that he had traded stolen property—specifically, a gold herringbone chain necklace, a men's diamond cluster ring, and a diamond horseshoe ring—to the Defendant for Oxycontin pills the night before. During the interview, Mr. Hurst explained that he did not want his wife to face charges for her knowledge of his crimes, and as a result, he called her from the detention center and instructed her to turn all the stolen goods that she might have over to officers.

Between January 27, 2007, and January 30, 2007, officers, including Lt. Braden and Det. Gilvin, went to the four locations identified by Mr. Hurst and recovered stolen goods.[10] On January 30, 2007, Det. Gilvin obtained a search warrant from Judge Layton, an Anderson County General Sessions Court Judge. Det. Gilvin, Lt. Braden, Det. Bowie, and other officers executed the search warrant the same day. Det. Bowie, who had been to the Defendant's residence several times, and Lt. Braden, who had been to the Defendant's residence five to ten times, were familiar with the Defendant's residence and its location, and they provided the directions that were incorporated into the warrant and affidavit, including the address on "Bolin" road, and could not possibly have been

---

[10]Testimony indicates that officers had to make two trips to one location, identified as one of the suspects' aunt's house in Andersonville, because the resident was not home at the time of their visit. It is not clear if officers recovered the items from this location prior to swearing out the warrant, but from the face of the affidavit, it appears that items had been recovered from all four locations prior to the swearing out of the affidavit.

confused as to its location and/or mistaken as to the structure to be searched. The affidavit underlying the warrant alleged as follows:

> (A) . . . . During the course of an investigation of vehicle burglaries that occurred in Anderson County, TN, between November 1, 2006 and January 27, 2007, John Daniel Hurst was arrested. John Daniel Hurst gave the following information to your affiant [Det. Gilvin]: That on Saturday morning, January 27, 2007, at approximately 1:00 AM, he took items that he had stolen from a vehicle to the residence of Michael R. Sharp. He traded a gold herringbone chain necklace, a men's diamond cluster ring, and a diamond horseshoe ring to Michael R. Sharp in exchange for oxycontin pills, a Schedule II narcotic. John Daniel Hurst states that he has been to the residence of Michael R. Sharp on numerous occasions and has sold for cash or traded for narcotics, stolen property.

> (B) That John Daniel Hurst has advised officers that he has sold or traded other stolen property at four different locations in Anderson County, TN. He gave officers these names and locations. Officers have recovered said items from the locations identified by John Daniel Hurst.

Ex. 1 at 1-2.

A return on the warrant was made the same day, January 30, 2007. Among other items, numerous firearms, a GPS, a digital camera, and jewelry were found during the execution of the search warrant. However, no herringbone gold chain, diamond cluster ring, horseshoe diamond ring, or Oxycontin pills were found.

On February 2, 2007, Det. Harper of the KPD interviewed Mr. Hurst. Prior to this interview either Det. Gilvin or Det. Bowie told Det. Harper that Mr. Hurst had stated that he sold stolen goods to the Defendant. Although Mr. Hurst was generally cooperative in his interview with Det. Harper, he refused to discuss the Defendant when asked about him.

On August 28, 2007, a confidential informant, working with TBI Agent Teresa Woodward, made a controlled purchase of Oxycontin from the Defendant's wife, Leslie Sharp, at the Defendant's residence. Det. Bowie swore to an affidavit referencing this controlled purchase, a May 2002 search of the Defendant's residence, and the January 2007 search of the Defendant's residence. Based upon Det. Bowie's affidavit, Judge April Meldrum, an Anderson County Juvenile Court Judge, issued a warrant to search the Defendant's residence on August 28, 2007, at 4:25 p.m. This warrant was executed on the morning of August 29, 2007, and after executing the warrant, Det. Bowie swore to a second affidavit stating that in executing the previous warrant he had seen consumer electronics, vehicles, and other equipment at the Defendant's residence in numbers that were inconsistent with personal use and some of which had had identifying marks obscured or destroyed. Based upon this affidavit, Judge Meldrum issued another warrant to search the Defendant's residence on August 29, 2007, at 11:05 a.m. This warrant was also executed on August 29, 2007.

Additional findings of fact will be incorporated in the body of this report and recommendation as is appropriate or necessary.

## III. ANALYSIS

In his initial Motion to Suppress [Doc. 28], the Defendant moves the Court to suppress all evidence, including physical evidence and oral statements, seized or obtained as a result of the search of the Defendant's residence on January 30, 2007. In his Second Motion to Suppress [Doc. 31], the Defendant moves the Court to suppress all evidence, including physical evidence and oral statements, seized or obtained as a result of the searches of the Defendant's residence on August 29,

2007.[11]

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. In this respect, a judge shall not issue a warrant for the search of a home or personal property except upon a finding of "probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause to search is "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). To make such a showing "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. at 244 n.13. Thus, the Supreme Court has observed that

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162, 45 S. Ct. 280, 288, 69 L. Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. Brinegar v. United States, 338 U.S. 160, 176, 69 S. Ct. 1302, 1311, 93 L. Ed. 1879 (1949).

Texas v. Brown, 460 U.S. 730, 742 (1983). In other words, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Whether probable cause to issue a search warrant exists is evaluated by looking at the totality of the circumstances. Gates, 462 U.S. at 238.

---

[11]The Defendant's arguments for suppress refer extensively to the warrants that were issued in this case during the course of 2007. For clarity, the Court will refer to these warrants as follows: the warrant issued January 30, 2007, at 11:34 a.m. and executed the same day is **"the first search warrant;"** the warrant issued August 28, 2007, at 4:25 p.m. and executed on the morning of August 29, 2007, is **"the second search warrant;"** and the warrant issued August 29, 2007, at 11:05 a.m. and executed on the same day is **"the third search warrant."**

Initially, the Court would note that the issuing judge's determination that probable cause exists is entitled to "'great deference.'" United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (quoting Gates, 462 U.S. at 236). This deferential standard promotes the preference for the use of search warrants as opposed to warrantless searches. Id. In determining the sufficiency of the search warrant affidavit, the Court is "concerned only with the statements of fact contained in the affidavit." United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); see also Whiteley v. Warden, 401 U.S. 560, 565 (1971). In reviewing the propriety of the search warrant, the Court considers "the evidence that the issuing magistrate had before him only 'to ensure that [he] ha[d] a substantial basis . . . for concluding that probable cause existed.'" United States v. Jones, 159 F.3d 969, 973 (6th Cir. 1998) (quoting Gates, 462 U.S. at 238-39) (alterations in original). In addition, "a warrant application must provide sufficient information to allow an issuing judge to independently determine probable cause; his action cannot be a mere ratification of the conclusions of others." United States v. Gunter, No. 07-5277, 2009 WL 37481, at *6 (6th Cir. Jan. 8, 2009) (citing Gates, 462 U.S. at 239).

## A. First Motion to Suppress [Doc. 28]

In his first Motion to Suppress [Doc. 28] and its supporting memorandum [Doc. 29], the Defendant argues that the affidavit supplied by Det. Gilvin on January 30, 2007, did not contain sufficient evidence to support a finding of probable cause because (1) certain information was falsely attributed to Mr. Hurst and therefore should not have been considered in the probable cause determination and (2) officers did not properly corroborate the information provided by the informant, Mr. Hurst, or confirm his reliability as an informant.

### 1. Veracity of the Contents of the Affidavit

To challenge the veracity of statements made in an affidavit that forms the basis for a

warrant, a defendant must point to specific false statements that he claims were made intentionally or with reckless disregard for the truth. Franks v. Delaware, 438 U.S. 154, 171 (1978). An offer of proof, such as a supporting affidavit, must accompany these specific allegations. Bennett, 905 F.2d at 934. Even when these requirements are met, a hearing will only be held in cases where, absent the challenged statements, the remaining content in the affidavit is not sufficient to support a finding of probable cause.

If a hearing is held, a defendant must show at the hearing, by a preponderance of the evidence, that false statements were made either intentionally or with reckless disregard for the truth and that without these statements there is insufficient content in the affidavit to support a finding of probable cause. If he makes this showing, the evidence found during the execution of the search warrant should be suppressed. Id. at 934.

As discussed in the Court's Memorandum and Order [Doc. 59], the Defendant has filed sufficient, specific evidence supporting his claim that certain statements in Det. Gilvin's affidavit were false–namely, Mr. Hurst's affidavit [Doc. 30]. The allegedly false statements are the heart of the evidence supporting the probable cause finding that allowed the first search warrant to issue, and the information that would remain in the affidavit after redaction of these statements could not support a finding of probable cause. Thus, these statements are material. Accordingly, the Court found that the Defendant was entitled to a hearing as to the veracity of the statements in Det. Gilvin's affidavit, and such hearing has been conducted.

Thus, the Defendant was required to show, by a preponderance of the evidence, that false statements were included in Det. Gilvin's affidavit either intentionally or with reckless disregard for the truth and that without these statements there is insufficient content in the affidavit to support a

finding of probable cause. The first step in determining whether the Defendant has met his burden is to evaluate the veracity of statements contained in the affidavit. First, the Court must determine the veracity of the statement that Mr. Hurst told Det. Gilvin he had traded certain specified jewelry to the Defendant for Oxycontin the night before his arrest, because this statement is key to the probable cause determination. Second, the Court must determine the veracity of the statement that Mr. Hurst had told officers other locations where stolen goods could be found and that goods had been found at these locations, because this statement speaks to the reliability of the informant and, thus, also weighs in the probable cause determination. At the hearing, the Court heard testimony that was diametrically opposed on the veracity of these statements.

First, the Court looks to Det. Gilvin's testimony. Det. Gilvin has been an law enforcement officer for thirty years. The Defendant presented no evidence to undermine Det. Gilvin's behavior as an officer, and Det. Gilvin's long service record indicates to the Court that Det. Gilvin is a truthful officer with respect for the grave seriousness of presenting false testimony to a court. Det. Gilvin's signature on his affidavit attests that the contents of the affidavit are true, and the Court notes that the specificity of the items that were traded–a herringbone chain, a men's diamond cluster ring, and a horseshoe ring–lends credibility to that statement.

In contrast, the Court finds Mr. Hurst's credibility as a witness to be diminished by a number of factors. Mr. Hurst admitted at the hearing that he has committed, and been convicted, of numerous thefts. These convictions, standing alone, do not stand as grounds for completely discounting Mr. Hurst's testimony, but they should be noted when determining whether to credit his testimony over that of a long-term law enforcement officer. The Court also notes that Mr. Hurst's repeated admissions that he was a extremely addicted to pills, including Oxycontin, at the time of

his arrest supports discounting his testimony. The Court acknowledges that a "witness's use of drugs may not be used to attack his or her general credibility, but [rather, may only be used to attack] his or her ability to perceive the underlying events . . . ." United States v. March, 114 Fed.Appx. 671, 674 (6th Cir.2004) (quoting Jarrett v. United States, 822 F.2d 1438, 1446 (7th Cir.1987)).

As stated above, there are two statements in the affidavit on which Mr. Hurst and Det. Gilvin offered opposing testimony. Mr. Hurst and Det. Gilvin also offered differing testimony on a number of other issues that were not included in the affidavit. In making its credibility the Court has considered whether Mr. Hurst's testimony or Det. Gilvin's testimony was corroborated on these other issues. For example, on the issue of whether Mr. Hurst waived his rights at the detention center, Det. Gilvin testified that Mr. Hurst was advised of his rights and executed a waiver of these rights in the presence of himself and Lt. Braden, [Doc. 53 at 26-27], whereas Mr. Hurst stated that he could not remember being advised of his rights and executing a waiver of such, [Doc. 54 at 90]. The testimony of Lt. Braden confirmed Det. Gilvin's version of the events [Doc. 53 at 98-99], as did Exhibit 19, a rights waiver executed by Mr. Hurst and dated January 27, 2007.

Looking specifically at the statement about fencing jewelry to the Defendant, the Court finds Det. Gilvin's testimony on the issue to be credible and finds that the Defendant has failed to demonstrate, by the preponderance of the evidence, that this statement was false. For the general reasons outlined above, the Court finds Det. Gilvin to be a more credible source of information about the detention center interview than Mr. Hurst is. This general credibility determination is bolstered by the testimony of other officers corroborating Det. Gilvin's statement that Mr. Hurst provided information about the Defendant. For example, Lt. Braden testified that Det. Gilvin obtained a statement from Mr. Hurst about stolen property at the Defendant's residence [Doc. 53 at 100], and

Det. Harper identified the Defendant as a "Hurst fence" in his notes and recalled that this information about the Defendant came from Det. Gilvin or Det. Bowie. [Doc. 53 at 129, 132]. This was not information they obtained from Mr. Lee or Mr. Lawson, but Det. Harper implied that it was information they had obtained from Mr. Hurst. [Doc. 53 at 132]. In addition, Det. Gilvin's notes from his interview with Mr. Hurst at the detention center reinforce his testimony that Mr. Hurst provided this information about the Defendant, see Exhibit 21. The detective's notes contain a notation about the specific jewelry on a page which Det. Gilvin identified as containing his notes about Mr. Hurst and on which Mr. Hurst's former address is written.

In contrast, the Court finds Mr. Hurst's stance that he did not know the Defendant, at the very least, omits pertinent information about his social connections to the Defendant, and this important omission undermines Mr. Hurst's testimony on the issue. Mr. Hurst has maintained that he did not know the Defendant. For example, he stated in his affidavit that he "did not even know [the Defendant]" [Doc. 30 at ¶ 12] and stated at the hearing that he did not "know a gentlemen named Michael Sharp" [Doc. 54 at 88]. Nonetheless, on cross-examination, Mr. Hurst confirmed that his wife, Ashley Hurst, knew the Defendant's wife, Leslie Sharp, and that his wife had a pill problem; Mr. Hurst also admitted that the two women took pills together [Doc. 54 at 109]. Mr. Hurst later admitted that he might have "known of" the Defendant, but he explained that he did not know where the Defendant lived, what the Defendant looked like, or anything about him. [Doc. 54 at 110]. When asked why he did not reveal that his wife had connections to the Defendant's wife, Mr. Hurst stated that he had not been asked that specific question when composing his affidavit and, thus, he did not volunteer the information. [Doc. 54 at 128]. Mr. Hurst then explained that, when he was asked about the Defendant for purposes of composing the affidavit, he explained that he "did not deal with

45

Michael Sharp," [Doc. 54 at 128], but admitted he knew the Defendant lived somewhere in Anderson County [Doc. 54 at 105]. The Defendant also admitted he had traded stolen goods for Oxycontin with other persons in Lake City, Tennessee. [Doc. 54 at 108].

In a final summary of his admissions on cross-examination, the following exchange occurred:

> Q: Well, again, I would like you to answer my question. You knew of him. You at least admit that now.
>
> A: I mean, I knew that my wife was, you know, messing with his old lady. I never met him. I couldn't tell him where they lived.
>
> Q: That's not the question I asked. Could you just listen. If you don't understand, tell me.
>
> A: Okay.
>
> Q: Can we agree that you at least knew of Michael Sharp in Anderson County? Can we agree on that?
>
> A: Yeah, I guess we could. Yes, sir.
>
> Q: I'm not trying to trick you.
>
> A: I know that.
>
> Q: Okay. And you knew of him through your wife?
>
> A: Yes, sir.
>
> Q: So you knew his name?
>
> A: Yes, sir. I have heard his name. I mean --

When compared to the Defendant's affidavit and his initial stance at the hearing, this exchange leads the Court to believe that the Defendant has not been entirely truthful about his ties to the Defendant. His testimony at the hearing was full of equivocations about the meaning of the word "know," which it appears to the Court Mr. Hurst has employed both in his affidavit and in his testimony to obscure his actual connections to the Defendant. Thus, the Court concludes that Mr. Hurst is not fully credible on the issue of his alleged statements to Det. Gilvin.

The Court also notes that the Defendant denied telling Officer Harper he did not want to talk about the Defendant [Doc. 54 at 107], contrary to Officer Harper's testimony [Doc. 53 at 126]. The Court finds Officer Harper's testimony was not impeached in any way at the hearing and finds his testimony on this issue to be credible. While not directly on point, it does further undermine the Defendant's credibility.

The Court has considered the foregoing in making its determination of credibility as to the statement about trading jewelry to the Defendant, and the Court finds that the Defendant has failed to carry his burden of showing, by the preponderance of the evidence, that this statement was false. Det. Gilvin's history in law enforcement weighs in favor of finding to him to be the more credible witness. The Court finds that the contemporaneous written records–Det. Gilvin's notes, Det. Harper's notes, and the affidavit itself–support Det. Gilvin's testimony. In addition, the testimony of fellow officers support Det. Gilvin's testimony. In contrast, the Defendant has testified that he was extremely addicted to prescription pain killers at the time of the events in question, and no testimony has been offered to corroborate his testimony. Further, and most importantly, the Defendant's omission of the ties between his wife and the Defendant's wife and his general knowledge of the Defendant undermines and, arguably, directly contradicts his initial stance that he did not know the Defendant at all.

Turning to the statement about the four locations, the Court finds that the Defendant has again failed to demonstrate, by the preponderance of the evidence, that this statement was false. In making its decision, the Court first considered the general credibility of Det. Gilvin and Mr. Hurst, as discussed above. The Court also considered Det. Gilvin's specific testimony on this issue, which is admittedly less clear and thorough than the Court would like. However, Det. Gilvin's testimony

was corroborated by Lt. Braden. In contrast, Mr. Hurst's testimony has not been corroborated and directly contradicts Det. Gilvin's affidavit.

At the hearing, Det. Gilvin testified that Mr. Hurst gave him the four locations and he, in turn, informed other officers of the locations. [Doc. 53 at 80]. Det. Gilvin recalled other officers, went to the locations and recovered the goods, such as a GPS and tools, but he only recalled going to one location, which was the home of one of the suspects' aunt. [Doc. 53 at 64]. Det. Gilvin could not recall the other three locations at the time of the hearing. [Doc. 53 at 64]. However, Det. Gilvin testified that at the time he completed the affidavit he knew what the four specific locations were [Doc. 53 at 80]. Det. Gilvin did not have a specific recollection of items being recovered from all four locations at the time of the hearing, but he testified that at the time he swore to the affidavit he was aware that officers had recovered items at four locations that had been identified by Mr. Hurst. [Doc. 53 at 81-82]. Det. Gilvin believed that Det. Bowie and Lt. Braden were the officers that were working on this case and could offer additional information on the recovery efforts. [Doc. 53 at 82-83].

Looking to other testimony in the record, Lt. Braden testified that he recalled going to four or five locations in Andersonville, Clinton, south Clinton, and perhaps, Claxton, to pick up goods with Det. Gilvin. [Doc. 53 at 100]. Lt. Braden testified that he went with Det. Gilvin and that it was his understanding that the information about these locations was given to Det. Gilvin by Mr. Hurst. [Doc. 53 at 101]. Det. Gilvin's notes include notations about a number of locations, including the home of Mr. Lawson's aunt. However, these locations are not identified with sufficient specificity to allow the Court to determine whether they are in Anderson County or are the four locations identified alleged to have been identified by Mr. Hurst.

In contrast to Det. Gilvin's testimony and Det. Gilvin's affidavit, Mr. Hurst has maintained that he never told Det. Gilvin of any locations in Anderson County. [Doc. 54 at 117].

The evidence supporting the statement in the affidavit that Mr. Hurst supplied information about four locations in Anderson County is certainly less substantial than the evidence supporting the statement about the Defendant. Over two years after the events in question, Det. Gilvin's memory of the locations appears to be less than clear, and the locations were only identified in vague terms in the affidavit. However, Lt. Braden has independently testified to a recollection of the locations. Lt. Braden has stated that the four locations information came from Det. Gilvin and that his understanding was that the information was supplied by Mr. Hurst. In addition, certain specific items obtained (e.g. GPS, tools, jewelry) were noted as being recovered at these locations. The Court has examined pertinent case law in this Circuit and concludes that the Defendant's statement that he did not give Det. Gilvin the information without more does not meet his burden to prove falsity by the preponderance of the evidence. Contra United States v. Bennett, 905 F.2d 931 (6th Cir. 1990) (finding the defendant had met his burden where the affiant officer admitted in his testimony at the Franks hearing that his statements in the affidavit were false and that he had not seen the purported marijuana). In light of this corroboration and the general credibility considerations outlined above, the Court concludes that the Defendant has failed to show, by the preponderance of the evidence, that the statement about the four locations was false.

Because the Court concludes that neither of the contested statements were false, it is not necessary for the Court to address whether such statements were intentionally or recklessly included in the affidavit.

*2. Corroboration and Reliability*

Veracity, reliability, and basis of knowledge are all highly relevant in determining the value of an informant's report and its weight in finding whether probable cause exists; however, these considerations are not rigid categories. Allen, 211 F.3d at 972-73 (quoting Gates, 462 U.S. at 230). Hearsay information, such as that supplied by an informant, will not be deemed insufficient simply because it is hearsay. See Gates, 462 U.S. at 241-42. Rather, "[i]t is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" Id. at 244-45 (quoting Jones v. United States, 362 U.S. 257, 269-71 (1960)).

Nonetheless, an affidavit must state facts supporting an independent judicial determination that an informant is reliable, but these facts are not required to take any particular form. United States v. McCraven, 401 F.3d 693, 697. For example, the Court of Appeals for the Sixth Circuit has instructed that: an affidavit could state that police corroborated significant parts of the informant's story; the affiant could attest "with some detail" that the informant provided reliable information in the past; there could be other indicia of the informant's reliability, such as a detailed description of what the informant observed first-hand, or the willingness of the informant to reveal his or her name. Id. A review of the sufficiency of the evidence supporting probable cause is limited to the information in the four-corners of the affidavit. United States v. Frazier, 423 F.3d 526, 531 (6th Cir. 2005).

In the present case, the information in the affidavit indicated that Mr. Hurst was a reliable informant and other information he had provided about criminal activity had been corroborated. The information provided by Mr. Hurst was not an "uncorroborated tip of an unknown informant."

50

United States v. Couch, 367 F.3d 557, 561 (6th Cir. 2004). The informant's identity was known to the Officers and was provided in the affidavit. The ability of officers to locate Mr. Hurst and hold him accountable should the information prove to be untrue adds to his credibility, see id. at 560-61. Further, the affidavit states that Mr. Hurst had identified four locations at which stolen property could be found and confirms that stolen property was found at these locations. The reliability of Mr. Hurst's other statements reduced concerns that officers were being fed "reckless or prevaricating tale," and added support to a finding a probable cause. Further, the fact that both the statement about the four locations and the statement about visiting the Defendant's home were statements against the Mr. Hurst's own interests increases the probability of their truthfulness. See Armour v. Salisbury, 492 F.2d 1032, 1035 (6th Cir. 1974); United States v. Higgins, 557 F.3d 381 (6th Cir. 2009).

Finally, the Defendant correctly notes that time period in which the officers obtained and confirmed the information from Mr. Hurst is not explicitly stated in the paragraph containing the statement about the four locations. However, the previous paragraph states that an investigation of burglaries that occurred between November 1, 2006, and January 27, 2007, revealed the information provided by Mr. Hurst and strongly implies that the same time frame applies to the statements contained in the next paragraph. The Court agrees with the Government that any other reading of the warrant would be strained and unreasonable.

Based on the foregoing, the Court finds that within the four corners of the affidavit there was sufficient information and corroboration to establish the reliability of Mr. Hurst's statements so as to support a finding of probable cause.

Accordingly, the Defendant's arguments that the evidence recovered in the execution of the

first search warrant should be suppressed because the warrant lacked probable cause fail.

**B. Second Motion to Suppress [Doc. 31]**

In his second Motion to Suppress [Doc. 31] and its supporting memorandum [Doc. 32], the Defendant argues that the second search warrant and the third search warrant rely in substantial part on evidence obtained from the search of the Defendant's residence pursuant to the first search warrant on January 30, 2007. On this basis, the Defendant moves for the evidence from the second and third search warrants to be excluded as the fruit of the poisonous tree, see Wong Sun v. United States, 371 U.S. 471 (1963). Alternatively, the Defendant argues that all three of the search warrants lack probable cause because they fail to describe the premises to be searched with sufficient particularity.

*1. Fruit of the Poisonous Tree*

In light of the Court's determination that Det. Gilvin's affidavit for the first search warrant does not contain false statements, includes sufficient information to corroborate the reliability of Mr. Hurst as an informant, and provides probable cause for the search warrant to issue, the second and third warrants cannot be the proverbial 'fruit of the poisonous tree,' as the Court has established there was no poisonous tree. Nonetheless, it is worth noting that even if the Court were to exclude the two sentences in the affidavit that Det. Bowie executed on August 28, 2007, that mention the first search warrant and its execution earlier in 2007, the remaining description of a controlled purchase supervised by TBI Agent Woodward on August 28, 2007, would provide more than sufficient grounds for a finding of probable cause. Accordingly, the Court finds that the Defendant's argument that the evidence recovered in the execution of the second and third warrants should be

suppressed as the fruit of the poisonous tree fails.

*2. Sufficient Particularity*

Finally, the Defendant argues that the third and fourth search warrants were not sufficiently particular. The Defendant bases his arguments on four facts: the existence of two mailboxes at the end of his drive; his submission that there are two residences on his property; the spelling of the road on which his property is located as "Bolin" rather than "Boling;" and the description of his home as having a screened-in porch when the porch had been converted to living space. The Defendant submits that these inaccuracies could have lead to the mistaken search of another residence. The Government did not speak to this issue directly in its response [Doc. 48], but it presented evidence at the hearing in opposition to the Defendant's position.

A warrant cannot issue unless it describes the place to be searched with requisite particularity. U.S. Const. amend IV. To determine if this requirement is met, the court must consider "whether the place to be searched is described with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched." United States v. Durk, 149 F.3d 464, 465 (6th Cir. 1998). "An error in a warrant does not automatically invalidate a search warrant," so long as officers are reasonably likely to locate the premises without mistakenly searching another premises. United States v. Pelayo-Landero, 285 F.3d 491 (6th Cir. 2002). Further, "the knowledge of executing officers... is a factor which may cure any insufficiencies in the search warrant's description of the premises." United States v. Brown, 49 F.3d 1162, 1169 (6th Cir. 1995).

The Court will first examine the Defendant's arguments concerning the multiple residences, multiple mailboxes, and lack of a screened-in porch, because all of these arguments address the officers' ability to distinguish the Defendant's actual residence from the other possible residences on the property. The Court finds the evidence as to whether the residences were actually occupied by third persons at the time of the search is somewhat thin. [See Doc. 53 at 87, 92 (Det. Gilvin testifying that he believed someone lived in the structure pictured in Exhibit 12), but see Doc. 54 at 27 (Det. Bowie testifying that he was unsure whether someone lived in the home structure pictured in Exhibit 16)]. However, the Court will assume that the Sharp property contained multiple occupied residences.

Looking first to the allegation of multiple mailboxes, Det. Gilvin testified at the hearing that there was more than one mailbox at the end of the Defendant's driveway, when the first search warrant was executed on January 30, 2007. [Doc. 53 at 71]. Exhibit 16, a photograph of the entrance to the Defendant's property that appears to have been taken on October 29, 2008, and developed on November 18, 2008, shows two mailboxes at the entrance. Based on this evidence, the Court finds there were two mailboxes at the entrance to the Sharp property at the time the search warrants in this case were executed. In addition, the Court finds, based upon the testimony at the hearing, that the house had no screened in porch at the time of either the January 30, 2007, or the August 29, 2007 searches.

However, even with multiple residences on the property, as evidenced by the multiple mailboxes, and even though the screened-in porch had been converted to living space, the Court finds that during the warrant executions the officers could locate and identify the premises to be searched with reasonable effort and there was no reasonable probability that another premises might

54

be mistakenly searched.

Though the directions and description in the first search warrant varies slightly from the directions and description in the second and third search warrants, the essential elements of the physical description, which distinguish the residence to be searched from other structures on the property are sufficiently similar to allow for a common analysis. The first search warrant describes the premises to be searched as "a single family dwelling with brown wood siding, shingle roof, and basement. . . ." The second and third search warrants describe the premises to be searched as "a cedar house with a screened in front porch with basement underneath . . . ." Thus, both physical descriptions note that the home has a shingle roof, a basement, and brown siding, although the second and third warrants are more descriptive in describing the siding as cedar.

Looking at the photographs of the other two dwellings on the property, Exhibits 12 and 16, both structures are essentially mobile homes with roofs built over them ("the modified mobile homes"). Both have white metal siding. Neither structure is brown; neither structure has wood siding; and neither structure has a basement. It is apparent from the photograph that the structure in Exhibit 12 has a metal, not shingle, roof. While it is not clear whether the roof built over the structure shown in Exhibit 16 is a shingle or metal roof, the Court finds that both structures are easily distinguishable from the premises described in the warrant based upon two obvious physical characteristics, the exterior color and material and the lack of a basement. Further, the structure shown in Exhibit 12 is also distinguishable because it has a metal roof structure rather than a shingle roof.

More importantly, at least one officer who was familiar with the home in which the Defendant resided took part in each of the searches. Lt. Braden participated in the execution of the

first search warrant on January 30, 2007 [Doc. 53 at 103-04]; he also believed he was at the execution of the second and third search warrants on August 29, 2007, but could not be sure of it [Doc. 53 at 118-19]. Lt. Braden estimated that prior to January 30, 2007, he had been to the Defendant's residence five to ten times. [Doc. 53 at 103]. Lt. Braden testified that there was no way he would have been confused about what structure he was supposed to be searching. [Doc. 53 at 105].

Det. Bowie testified that he also took part in both the January 30, 2007, and August 29, 2007, search warrant executions. Det. Bowie served as the affiant officer on the second and third warrants and testified that he had been to the Defendant's home several times including in 2002 when assisting a TBI investigation involving controlled purchases there, and twice to recover stolen property. He testified there was no possibility he would have searched any place other than the Defendant's residence. [Doc. 54 at 28-29]. Det. Bowie testified that the only house he had known the Defendant to reside in was the one described in the warrant. [Doc. 54 at 32]. Det. Bowie stated that officers did not search either of the modified mobile homes on the property and noted that, if officers had intended to search either of the modified mobile homes, he would have modified the description in the warrant to include those structures. [Doc. 54 at 27-28]. The Court finds that knowledge of Lt. Braden and Det. Bowie cured any insufficiencies that might have existed in the search warrant's description. See Brown, 49 F.3d at 1169.

The Court finds that the presence of two mailboxes at the end of the Defendant's driveway does not undermine the distinguishing physical characteristics identified in the warrant or undermine the officers' prior knowledge that the Defendant resided in the specified home and not the modified mobile homes. In the same vein, the conversion of the screened-in porch into living space did not

56

alter the home in a way that was reasonably likely to undermine Det. Bowie or Lt. Braden's knowledge of the home in which the Defendant resided. Further, both Det. Gilvin and Det. Bowie were able to identify the home in which the Defendant resided in a photograph that was taken after the screened-in porch had been converted [Doc. 53 at 47 and Doc. 54 at 7], and the record establishes that neither of the modified mobile homes had screened-in porches to confuse officers. Accordingly, the Court finds that neither the multiple mailboxes nor the inaccurate statement that the Defendant's residence still had a screened-in porch would have undermined the unique physical description and officer knowledge that were almost certain to prevent the mistaken search of another premises.

Based on the foregoing, the Court finds that the Defendant's allegations that the warrants are not sufficiently particular to distinguish between the home in which the Defendant resided and the other dwellings on the Defendant's property fails.

The Defendant also argues that the warrants were not sufficiently particular because the road on which the Defendant's property is located is spelled "Bolin" not "Boling." The Defendant presented two photographs of street signs at the hearing, which labeled the road as "Boling."[12] The Government presented numerous exhibits–the Sharps' drivers licenses and prescriptions, a consent to search form signed by the Defendant, booking records for the Defendant, Anderson County 911 records, and Mapquest search results–and the testimony of numerous witnesses at the hearing, all of which confirm the proper street name to be Bolin. Even assuming "Boling" is the correct road

---

[12] The Court notes that these photographs were marked as Exhibits 3 and 4, but were never moved or admitted into evidence. The Court further notes Lt. Braden testified that in January 2007 the street sign within Lake City read "Bolin" and had been changed later to "Boling." [Doc. 53 at 105].

name, there is no indication that there is another road named "Bolin," on which the officers would have found another home and mistakenly searched it. To the contrary, the Mapquest results indicate that there is no other road using the name "Bolin." It appears to the Court that both "Bolin" and "Boling" were names for the road on which the Defendant's property is located and were in common usage, both among residents and in official records.

Further, and again most importantly, the Court finds, based upon the testimony more fully explained above, that there was virtually no danger of the officers not being able to locate the Defendant's home or mistakenly searching a third party's residence because officers who were familiar with the Defendant's residence and its location participated in both the search on January 30, 2007, and the searches on August 29, 2007. The Court finds that this officer knowledge cured any insufficiencies that might have existed in the search warrant's description. See Brown, 49 F.3d at 1169.

Based on the foregoing, the Court finds that the Defendant's allegation that the warrants are not sufficiently particular because the street name in the warrants was spelled "Bolin" rather than "Boling" fails.

Thus, the Court finds that the first search warrant, second search warrant, and third search warrant described the place to be searched with sufficient particularity to enable the executing officer to locate and identify the premises with reasonable effort and finds that there was no reasonable probability that another premises might be mistakenly searched. Durk, 149 F.3d at 465.

## V. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities, the Court finds that: Det. Gilvin's affidavit did not contain false statements; Det. Gilvin's affidavit contained sufficient information corroborating Mr. Hurst's statements; the second and third search warrants are not the fruit of the poisonous tree; and all three search warrants identify the premises to be searched with sufficient particularity and were further cured by the knowledge of the executing officers. As a result, all of the grounds for suppression alleged in the Defendant's First Motion to Suppress [Doc. 28] and Second Motion to Suppress [Doc. 31] fail.

Therefore, it is **RECOMMENDED** that the Defendant's First Motion to Suppress **[Doc. 28]** and Second Motion to Suppress **[Doc. 31]** be **DENIED**.[13]

Respectfully Submitted,

_s/ C. Clifford Shirley, Jr._
United States Magistrate Judge

---

[13] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).