UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:07-CR-124 |
| | ) | (VARLAN/SHIRLEY) |
| MICHAEL RODNEY SHARP, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

_____All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court,

as may be appropriate. The Defendant is charged in a nine-count indictment [Doc. 19], with

numerous instances of: being a felon in possession of a firearm in violation of 18 U.S.C.§ 922(g)(1);

being a felon in possession of a stolen firearm in violation of 18 U.S.C. § 922(j); and possession of

a firearm with a barrel length of less than 18 inches without registering it in the National Firearms

Registration and Transfer Record in violation of 26 U.S.C. § 5861(d).

The Defendant has filed three separate motions to suppress addressing the evidence produced

by four different searches.[1] The Court held an evidentiary hearing to address the first two motions

---

[1]The Court refers to these searches as follows: the search pursuant to the warrant issued January 30, 2007, at 11:34 a.m. and executed the same day is **"the first warrant search;"** the warrant issued August 28, 2007, at 4:25 p.m. and executed on the morning of August 29, 2007, is **"the second warrant search;"** and the warrant issued August 29, 2007, at 11:05 a.m. and executed on the same day is **"the third warrant search;"** and the consent search of the Defendant's father's home which was initiated on August 29, 2007, after the third warrant search was underway, will be referred to as **"the consent search."**
Though the contents of this Report and Recommendation involves only the consent search, but it necessarily includes some facts regarding the execution of the second and third search warrants for context and explanation. Therefore, the Court, for clarity, will use the same terms as it did in its previous Report and Recommendation [Doc. 62].

to suppress on March 2, 2009, and the Court issued a Report and Recommendation [Doc. 62] on May 11, 2009, recommending that these motions be denied.

The Third Motion to Suppress [Doc. 57] was filed on March 30, 2009, after the first evidentiary hearing. The Government was given the opportunity to respond to the Third Motion to Suppress, and it did so on April 13, 2009 [Doc. 60]. The Court held an evidentiary hearing on the Third Motion to Suppress [Doc. 57], on May 14, 2009. Assistant United States Attorney Tracy Stone was present representing the Government. Attorney Ralph Harwell was present representing the Defendant, who was also present. The parties have not requested permission to file supplemental briefs after the hearing, and thus, this matter is now ripe for adjudication. Accordingly, the Court took the Third Motion to Suppress [Doc. 57] under consideration on May 15, 2009.

## I.    FACTS

At the hearing, the Court heard from three witnesses. Their testimony is summarized as follows.

### A.    Detective Jim Leinart

Detective Jim Leinart ("Det. Leinart") testified that he has been employed by the Anderson County Sheriff's Department ("ACSD") for thirteen years. At the time of the searches Det. Leinart was in the drug enforcement division of the ACSD.

Det. Leinart explained that when officers executed the warrants on the Defendant's home on August 29, 2007, there were several doors in the Defendant's home that officers needed to open. Det. Leinart explained that officers asked the Defendant for his keys and he gave them to the officers. Det. Leinart stated that these keys were used to search buildings and sheds that were within the scope of the search warrants. Det. Leinart confirmed that he understood the residence of the

Defendant's father, Mack Sharp, which is located across the street from the Defendant's home, was not within the scope of the search warrants. Det. Leinart confirmed that officers asked the Defendant for his keys to avoid cutting locks off the various outbuildings and containers.

Det. Leinart stated that, after he used the keys at the Defendant's home, another officer used the keys on another building, which Det. Leinart described as a ten foot by ten foot storage shed. Det. Leinart said he got the keys back from the other officer when he needed them at Mack Sharp's house. Det. Leinart recalled that he, Det. Bowie, Det. Gilvin, and Sgt. Breeden went down to Mack Sharp's residence. Det. Leinart said officers asked Mack Sharp if the Defendant had brought any guns down to his house and given them to him or asked him to store them. Det. Leinart said that Mack Sharp told officers that the Defendant had put guns in a locked closet in Mack Sharp's bedroom and in a gun cabinet. Det. Leinart stated that Mack Sharp said the Defendant had brought a couple of guns–as Det. Leinart recalled, a long barrel gun and a short barrel gun–down to his home a couple of weeks ago.

Det. Leinart recalled Mack Sharp stating that the Defendant kept the keys to the closet and cabinet. Det. Leinart explained that the officers at Mack Sharp's house went and got the keys from the officer's who were using them at the Defendant's property across the street. Det. Leinart stated that the officers tried the keys one-by-one on the closet and did not ask Mack Sharp which key would open the lock. Det. Leinart explained that the gun cabinet was in the locked closet, and he stated that officers again just tried the keys until they found one that opened the cabinet. Det. Leinart stated that, after the closet and cabinet were opened, Mack Sharp stated that some of the guns were his, and the officers let him keep those guns. Det. Leinart noted that these guns were also in the closet and/or gun cabinet.

3

Det. Leinart stated that after the closet and cabinet were opened the officers no longer needed the keys. However, in order to secure the locations, including the Defendant's residence, the officers kept the keys overnight and returned them to the Defendant the next day. Det. Leinart stated that none of the officers questioned the Defendant about the guns after they were found in the closet and gun cabinet. Det. Leinart did not remember whether the closet in Mack Sharp's bedroom, in which the guns were found, was a typical closet or had other items stored in it. In summation, Det. Leinart testified that he did not recall asking Mack Sharp about his access to the closet or gun cabinet and that Mack Sharp just said he had guns in the closet and cabinet.

On cross examination, Det. Leinart confirmed that he had met both the Defendant and Mack Sharp before the date of the search. Det. Leinart said he had not seen any difference in Mack Sharp's "sharpness," and noted that the last time he saw Mack Sharp before the search was within a year of the search. Det. Leinart also confirmed that he knew Louise Sharp, the Defendant's sister and Mack Sharp's daughter, but he did not recall talking to her about her father's mental condition or his possibly suffering from Alzheimer's disease on August 29, 2007. Det. Leinart did not recall Louise Sharp telling him to leave her father alone. Det. Leinart could not remember whether he talked to Louise Sharp before or after officers used the keys to open the closet and cabinet.

Turning to prior searches of the Defendant's home, Det. Leinart confirmed that he worked for the ACSD in 2002, but he was not involved in an execution of a search warrant on the Defendant's home in 2002. He did remember that firearms found during that search were returned to Mack Sharp because they could not be returned to the Defendant. When asked if there were ninety guns taken in the 2002 search, Det. Leinart confirmed that, yes, there were 'a lot' of guns taken. Det. Leinart estimated that of the guns taken during that search approximately twenty-five

to thirty were returned to Mack Sharp. Det. Leinart stated that he did not have the list of firearms that were taken or returned in 2002. He noted that the detective who worked the case might have it, but he did not know who the detective was. He confirmed that it might have been Detective Bowie.

Det. Leinart confirmed that Mack Sharp's house is separated from the Defendant's residence by a road and again stated that he knew it was not within the scope of the search warrants. Det. Leinart stated that he initially had a conversation with Mack Sharp outside of his home. Det. Leinart said that a consent-to-search form was executed by Mack Sharp but he was not the officer that oversaw its execution. Det. Leinart said that another officer, whom he referred to only as "Breeden," obtained the written consent a few minutes after the officers arrived, but before the closet and gun cabinet had been opened.

Det. Leinart recalled that Mack Sharp was asked if the Defendant had guns in his house, and he replied that the Defendant had brought down some guns in the last couple of weeks. Det. Leinart confirmed that these statements were not recorded and that he did not write them down. Det. Leinart stated that Mack Sharp said he did not have the key to the closet or cabinet. Det. Leinart confirmed that the officers did not find any other key to the closet or cabinet other than those kept by the Defendant.

Again, Det. Leinart explained that no one said anything to him about Mack Sharp having Alzheimer's disease and, therefore, not being allowed to access the guns in the closet and cabinet. Det. Leinart recalled talking to Carl Bunch (a.k.a. "Frog"), but he did not recall talking to Mr. Bunch about the guns. Det. Leinart said that officers did not take any fingerprints off the closet or gun cabinet and did not find any weapon registrations. Det. Leinart said once the officers returned to the

station they ran the guns in the NCIS database and with the ATF to see if they were stolen.

Det. Leinart could not remember whether there were items in the closet at Mack Sharp's other than the gun cabinet. However, he did not recall seeing any clothing in the closet. Det. Leinart confirmed that the closet appeared to be meant for the storage of weapons, and he stated that he understood the guns within the closet belonged to the Defendant.

On redirect examination, Det. Leinart confirmed that normally firearms are registered with the ATF when they are purchased from a retailer. However, he agreed that when firearms are purchased or traded between neighbors, such paperwork is not generally completed.

On recross examination, Det. Leinart confirmed that there were several old guns and several new guns in the closet, and he explained that some of the guns were found to have been stolen within the last year. Det. Leinart stated that at least two of the firearms found in the closet and/or bedroom had been stolen recently. Det. Leinart recalled that one of these was a Colt gun in a pouch, and he explained that it had been returned to its owner about three or four months before the hearing. Det. Leinart believed the Colt was found in the closet; he said he did not know how it got in the closet. Det. Leinart did not remember Mack Sharp saying that anyone other than he and the Defendant had guns in the closet. Det. Leinart did not recall Mack Sharp mentioning that another son of his, Richard, had guns in the closet. Det. Leinart stated that the Colt gun, a ten caliber, was in the gun cabinet within the closet and was housed in its own plastic gun box that had a latch, but he could not remember whether the latch was being used. Det. Leinart could not remember the caliber of the other gun that he thought had been stolen recently, although he believed it was an over-under gun.[2]

---

[2]The Government interjected, and defense counsel and Det. Leinart confirmed, that the over-under was a 357-20 gauge, meaning that there were two barrels of different gauges, one 357 and one 20, stacked on top of one another in a single gun.

On a second redirect examination, Det. Leinart stated that he was not sure whether the 357-20 over-under gun that was found had been stolen, but he knew a small pistol had been stolen. And upon questioning by the Court, the Government confirmed that the 357-20 over-under gun was the only gun that was found outside the closet. All the other guns were either in the cabinet or in the closet or in both.

**B.      Detective Danny Bowie**

Detective Danny Bowie ("Det. Bowie") testified that he has been employed by the ACSD for fifteen years. Det. Bowie explained that he was involved in the August 2007 drug investigation that led to the searches at issue. Off hand, Det. Bowie could not think of any holes or gaps in Det. Leinart's testimony, but he explained that he was at the scene the entire time and could add to Det. Leinart's description.

Det. Bowie confirmed that he spoke to Mack Sharp. Det. Bowie said he asked Mack Sharp if the Defendant had brought any guns down to Mack Sharp's house. Mack Sharp said he had brought guns down and gave officers consent to go look in the house. Det. Bowie said that the officers came upon the closet and cabinet, and they asked Mack Sharp whether there were guns in the closet. Mack Sharp confirmed there were guns in the closet. Det. Bowie recalled Mack Sharp saying that there were certain guns that would be found behind the door, one of which was the 357-20 gauge over-under. Det. Bowie explained that the 357-20 was the only gun found outside of a locked area.

Det. Bowie said that he asked Mack Sharp if any of the guns belonged to him and asked for and was given consent from Mack Sharp to search. Det. Bowie was presented with a consent form dated August 29, 2007, which he confirmed was the consent form Mack Sharp had executed. It was

received into evidence as **Exhibit 1**without objection. Det. Bowie stated that the form was a waiver allowing officers to search Mack Sharp's residence, and Det. Bowie confirmed that he had witnessed Mack Sharp's signature on the form. Det. Bowie explained that a notation made at the top of the page indicated that Mack Sharp had a fifth grade education, and Det. Bowie recalled that Sgt. Breeden read the waiver form to Mack Sharp.

Det. Bowie stated that it was obvious to officers that the closet was locked because there was a padlock on the door. Det. Bowie stated that when he asked Mack Sharp for consent to search the closet Mack Sharp replied that he did not have the keys. Det. Bowie said he was not initially aware that the ACSD had the keys, but Det. Leinart told him that he thought he might already have the keys. Det. Bowie said that Mack Sharp did not tell the officers that the Defendant had the keys; he just said he did not have them. Det. Bowie said officers never asked Mack Sharp about cutting the locks because the officers knew the keys might fit and using the keys would be much easier to try first.

Det. Bowie confirmed that officers left the guns that Mack Sharp identified as his with him. Det. Bowie did not remember talking to the Defendant about the guns that day, but he did not know if any other officers did. Det. Bowie did not think that anyone asked Mack Sharp what key would open the closet or the cabinet, and he did not remember Mack Sharp volunteering that information.

Det. Bowie stated that he was aware that some of the guns that were found at Mack Sharp's had been reported as being stolen. Det. Bowie recalled that a Colt gun, which he believed was in a case, was stolen, and it was turned over to the stolen property division of the ACSD. Det. Bowie thought the Colt gun was found in the closet. Det. Bowie recalled that there was both a gun cabinet in the closet and a second gun cabinet outside the closet. Finally, Det. Bowie confirmed that he

knew the search at Mack Sharp's residence was not within the scope of the warrant obtained for the Defendant's property.

On cross examination, Det. Bowie confirmed that he has been familiar with the Defendant since 2002 and that he assisted in a 2002 search of the Defendant's residence. Det. Bowie recalled guns found in that search being returned to Mack Sharp. However, Det. Bowie denied that any firearms would have been returned to Mack Sharp if the Defendant was in the same car as Mack Sharp or if the Defendant was anywhere around Mack Sharp. Det. Bowie said he was not the officer who returned the guns and could not estimate the number that were returned to Mack Sharp. Det. Bowie said he had a list of the guns that were taken from the Defendant in 2002, but he did not have a list of the guns that were returned to Mack Sharp. Det. Bowie could not remember if the list of guns taken would be the same as the list of those returned. As to the guns found in 2007, Det. Bowie confirmed that some of the guns found in 2007 were the same ones that had been returned to Mack Sharp after the 2002 search. Det. Bowie said he tried to check and find out how many of the guns were the same, but he could not find out. He did recall that a small Browning pistol had been returned after 2002 and was also involved in 2007.

Turning to August 29, 2007, Det. Bowie could not remember when the search based upon the third search warrant started. Det. Bowie stated that at 2:00 p.m. he talked to Mack Sharp while the Defendant's property was still being searched by the property crimes unit of the ACSD. Det. Bowie recalled that Mack Sharp was outside of his house, so Det. Bowie walked over to the house to ask if the Defendant had brought guns over there. Det. Bowie explained that after Mack Sharp said the Defendant had brought guns over he asked for consent to look at them. Det. Bowie noted that he saw the over-under gun behind the bedroom door, and it was the only gun outside the closet.

Looking at the consent form, Det. Bowie said that he did not make the notation at the top of the page that says "5th-read & write a little." Det. Bowie stated that Sgt. Breeden made the notation and talked to Mack Sharp about his education. Det. Bowie recalled Sgt. Breeden asking whether Mack Sharp understood his rights and consent, and Mack Sharp said he did. Det. Bowie confirmed that he knew Louise Sharp, but he said he did not talk to her at the time he was getting consent from Mack Sharp. Det. Bowie stated that he and Sgt. Breeden talked to Mack Sharp while Det. Leinart went to get keys. Det. Bowie said he did not talk to Mack Sharp about why he did not have a key to the closet. Det. Bowie again confirmed that he witnessed Mack Sharp's signature on the consent-to-search form, and he said Mack Sharp was told where to sign. When asked whether Mack Sharp seemed alert, Det. Bowie observed that Mack Sharp had common sense and was able to make the decision to sign the form. Det. Bowie stated that no one other than the three officers were at Mack Sharp's house at the time the consent form was executed.

Det. Bowie stated that after Mack Sharp gave verbal consent he said he did not have a key to the closet. Det. Bowie noted that when Mack Sharp signed the consent form Det. Bowie knew that Mack Sharp did not have a key and Det. Leinart had gone to get it. Det. Bowie said that in response to his question about which guns belonged to the Defendant, Mack Sharp said that the Defendant had given him the over-under gun and denied that it was stolen.

On redirect examination, Det. Bowie stated that Mack Sharp said the Defendant gave him the 357-20 over-under gun about three months before the search. Det. Bowie went through the time-line of the events at Mack Sharp's house and stated that, first, Mack Sharp was asked for consent verbally. Mack Sharp responded that he did not have the keys, and at that point, Det. Bowie thought officers might have the keys. He recalled that thereafter the officers then obtained Mack Sharp's

written consent. In recalling the exact exchange, Det. Bowie stated that in response to the request for verbal consent, Mack Sharp responded, "I don't have the keys," and an officer responded "We may have the keys." Mack Sharp replied "Well then go ahead and search." Det. Bowie said officers then went and retrieved the keys, and thereafter, Mack Sharp executed the written consent.

**C.      Ms. Louise Ann Sharp**

Louise Ann Sharp ("Ms. Sharp") testified at the hearing that she was the Defendant's sister and Mack Sharp's daughter. Ms. Sharp recalled that in 2007 she saw Mack Sharp once or twice per week. Ms. Sharp explained that when she takes her father, Mack Sharp, to a doctor's office she fills out all the necessary forms because he cannot complete them. Mack Sharp just signs his name at the bottom, as directed. Ms. Sharp stated that in 2007 she filled out forms for her father. Ms. Sharp explained that Mack Sharp lives alone but someone goes by his house to check on him two or three times per week. Ms. Sharp pointed out that her brother, the Defendant, being next door is helpful. She noted that her father has forgotten that he is using the stove and caught things on fire before.

Ms. Sharp recalled that she had been to Mack Sharp's house to clean before and had him open the closet for her to try to put clothes in it. Ms. Sharp could not remember whether there was a lock on the closet door at that time. Ms. Sharp could not remember if there was a time when Mack Sharp gave up his key to the closet. Ms. Sharp recalled a time when she had retrieved a suit out of the closet so that her father could wear it to a funeral. Ms. Sharp could not remember when that funeral took place.

Ms. Sharp said she was working on the morning of August 29, 2007, and she went to Mack Sharp's house that morning. She remembered talking to Agent Barney, which the Court took to mean ATF Agent Barney Waggoner, and Detective Gilvin. Ms. Sharp stated that she pulled onto

her father's property and told the officers that her father was sick and suffered from Alzheimer's disease. Ms. Sharp said she asked the officers if they had "papers" to search her father's house, and the officers responded that she should leave before she was arrested.

On cross examination, Ms. Sharp could not recall whether the funeral she had described took place before or after August 2007. She said she thought it was before, and she stated that the cleaning incident she described was definitely before August 2007. Ms. Sharp stated that the cleaning incident was probably a year before. She stated that at the time the closet was locked and her father opened it. In regards to the funeral, Ms. Sharp could not recall who it was for or when it was, but she said that it was within three or four years of the hearing. She stated that the closet door was locked with a door lock not a pad lock. She said that a pad lock was not on the door at the time of the funeral or the cleaning and noted that there was no fixture to put a pad lock on.

Ms. Sharp acknowledged the other witnesses that had testified at the hearing, Sgt. Leinart or Det. Bowie, and stated that she had not talked to either of them about her father's condition. Ms. Sharp recalled talking to them, but not about her father. Again, Ms. Sharp confirmed that she spoke to Agent Barney and that he told her she needed to leave the scene.

On redirect examination, Ms. Sharp stated that, in her opinion, her father, Mack Sharp, would not have understood a waiver of his constitutional rights. Ms. Sharp stated that the times she accessed the closet there was no deadbolt, just the doorknob itself. Ms. Sharp further noted that the bedroom where the closet is located also has a lock on the door to get into it.

On recross examination, Ms. Sharp said that she heard the testimony from other witnesses that her father was able to identify other guns. She explained that all of the guns were her fathers; the Defendant, her brother, gave them to him. However, Ms. Sharp stated that her father did not

understand the gift. Ms. Sharp explained that her father can remember things from ten years ago but not recent events. Ms. Sharp said that she did not have any reason to doubt the testimony that the Defendant gave her father guns within three months of the search because she never talked to either her father or the Defendant about it. Ms. Sharp confirmed that her brother does not give her gifts beyond holiday gifts.

Finally, on a second redirect examination, Ms. Sharp confirmed that her father Mack Sharp was a gun collector for years, but she said she had no clue how many guns he had.

## II.    FINDINGS OF FACT

Based upon the testimony at the hearings, the parties' memoranda, and the Court's review of the exhibits to the hearings, the Court finds the following facts:[3]

The Court finds the testimony of Louise Sharp about her father's condition and her and her father's access to the closet to be credible, even though Ms. Sharp was unable to recall the exact dates of certain events. Based on her testimony, the Court finds that approximately a year prior to the events in this case, Mack Sharp, the Defendant's father, had access to the closet, where many of the firearms underlying the present charges were later found. At that time, there was no padlock on the closet door, and Mack Sharp stored some articles of clothing in the closet.

Although the severity of Mack Sharp's mental impairment is not clear, at some point before August 29, 2007, a padlock was placed on the closet door, in an apparent attempt to keep Mack Sharp from accessing the firearms inside. The Defendant retained the only known key to this padlock and retained the only known key to the locked gun cabinet inside the locked closet.

---

[3]Additional findings of fact will be made in and included in the body of the Court's analysis where pertinent.

13

Turning to the events surrounding the consent search, on August 28, 2007 at 4:25 p.m., a warrant to search the Defendant's residence was issued. ACSD officers executed this warrant on the next morning, August 29, 2007, and after executing the warrant, officers sought and obtained a second warrant to search the Defendant's residence on August 29, 2007, at 11:05 a.m. This warrant was executed during the afternoon of August 29, 2007. While executing these warrants, officers came across a number of containers and areas at the Defendant's residence that were locked. In order to avoid cutting off or destroying these locks, officers asked the Defendant for his keys to these containers and areas. The Defendant turned over his keys, and the keys were used to search a number of sheds, outbuildings, and other areas, which were within the scope of the warrants.

In the early afternoon of August 29, 2007, and while the search at the Defendant's home continued, officers walked across the street to Mack Sharp's home. Mack Sharp was on his porch, and Det. Bowie asked Mack Sharp if the Defendant had brought any firearms down to his home. Mack Sharp confirmed that the Defendant had, and thereafter, officers asked for verbal consent to search Mack Sharp's home, which he gave.

Officers entered the home and found the closet. Officers asked Mack Sharp if there were firearms that the Defendant had brought down being stored in the closet, and he confirmed that there were. Officers requested consent to search the closet, but Mack Sharp replied by stating that he did not have the keys. At that point, Det. Leinart, an officer who was involved in obtaining the Defendant's keys earlier and using them at the Defendant's residence, spoke up and noted that ACSD officers might already have the key to the closet. In response, Mack Sharp said, in substance, "Well, then go ahead and search." The officers retrieved the Defendant's keys from other officers

still working across the street at the Defendant's residence.  Det. Bowie and Sgt. Breeden advised Mack Sharp of his rights, and he executed a written consent form.  Officers attempted to use a number of the keys on the closet door lock and, thereafter, the cabinet lock and, through trial and error, found the keys that opened both the closet and the gun cabinet.  Both the closet and cabinet were opened and a number of firearms were found therein.[4]

Det. Bowie and other officers on the scene asked Mack Sharp which firearms belonged to him.  He identified a number of the firearms as his, and the officers left these firearms with him.  The officers confiscated the other firearms, which they believed were the Defendant's.

## III.  ANALYSIS

The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures.  U.S. Const. amend. IV.  A search without a warrant is "per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967).  Voluntary consent to search, obtained from an individual with a privacy interest in the item to be searched, is one such exception.  See United States v. McCauley, 548 F.3d 440, 446 (6th Cir. 2008).  The Government bears the burden of proving that voluntary consent to search was given, see id., and, thus, that the warrantless search is not per se unreasonable or illegal.

Because consent to search serves as an exception to the rule against warrantless searches only when given by a person with a privacy interest in the item to be searched, the first issue before a court when the government argues that consent has been given is whether the defendant has shown

---

[4]Testimony indicates that at least one firearm, the 357-20 over-under gun, was found outside the closet.  However, the suppression issue is addressed only toward the firearms found in the closet and found within the cabinet in the closet.  [See Doc. 57 at 1].

15

a legitimate expectation of privacy in the item or area to be searched, see United States v. King, 227

F.3d 732, 743 (6th Cir. 2000) (citing Rakas v. Illinois, 439 U.S. 128, 140 (1978) and Katz, 389 U.S.

at 353).  To determine whether a legitimate expectation of privacy exists, a court must evaluate: (1)

whether the defendant has an actual expectation of privacy in the item or area to be searched and (2)

if there is an actual expectation of privacy, whether it is one that society is prepared to recognize as

reasonable.  King, 227 F.3d at 743.  In making its determination, a court should consider a number

of factors including  whether the defendant has the right to exclude others from the place in question;

whether he has taken normal precautions to maintain his privacy; whether he has exhibited a

subjective expectation that the area would remain free from governmental intrusion; and whether he

was legitimately on the premises.  Id. at 744.

    Assuming a defendant demonstrates a legitimate expectation of privacy, the warrantless

search may, in some instances, be valid where consent to search was given by a third party at the

scene.  Consent searches are a well-recognized exception to the general rule against warrantless

searches.  "An officer with consent needs neither a warrant nor probable cause to conduct a

constitutional search."  United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996) (citing

Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)).

    The consent exception is not limited to consent from the defendant.  As the United States

Supreme Court has explained, "when the prosecution seeks to justify a warrantless search by proof

of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show

that permission to search was obtained from a third party who possessed common authority over or

other sufficient relationship to the premises or effects sought to be inspected."  United States v.

Matlock, 415 U.S. 164, 171 (1974).  This common authority is not based upon the "law of property

with its attendant historical and legal refinements," but instead is present where there is, "mutual use of the property by persons generally having joint access or control for most purposes, so . . . that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. at 172 n. 7.

Even where common authority does not exist, suppression of evidence may not be necessary where officers justifiably relied upon the apparent authority of the third person to consent to a search. United States v. Waller, 426 F.3d 838, 846 (6th Cir. 2005). Because "[w]hen one person consents to a search of property owned by another, the consent is valid if 'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'" Id. (quoting Jenkins, 92 F.3d at 436). However, "the government cannot establish that its agents reasonably relied upon a third party's apparent authority 'if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry.'" Waller, 426 F.3d at 846 (quoting United States v. McCoy, 1999 WL 357749, at *10 (6th Cir. May 12, 1999)). Further, "[w]here the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use of the property, warrantless entry without further inquiry is unlawful." Waller, 426 F.3d at 846 (quoting McCoy, 1999 WL 357749, at *10).

The Court of Appeals for the Sixth Circuit has issued a number of decisions that, while not factually identical to the present situation, provide useful instruction on the issues presented. For example, in United States v. Waller, 426 F.3d 838 (6th Cir. 2005), the defendant moved to suppress firearms found in a piece of luggage during a consent search. A condition of Waller's release on bond was that he not return to his prior residence. Id. at 842. Because he could not return to his

17

previous residence, Waller asked a friend, Riley Howard ("Howard"), if he could store belongings at his apartment.  Id.  Waller stored a brown luggage bag, a few garbage bags of clothing, and some food at the residence.  Id.  Waller kept these items at Howard's residence and also showered there, but he did not stay overnight.  Id.  Officers later came to Howard's residence to serve an arrest warrant on Waller and locate a possible victim.  Id.  After arriving at Howard's, the officers obtained Howard's consent to search the apartment.  Id.  Officers located the brown luggage bag, which was zipped closed.  Id.  Officers opened it without asking Waller, who was already in custody for consent.  Id. at 842, 847.  Officers found firearms inside it, and asked the apartment's occupants whether the bag or the weapons belonged to them.  Id. at 842.

The district court denied Waller's motion to suppress and held that he lacked standing and that Howard's consent was sufficient to search the luggage bag.  Id. at 843.  On appeal, the government argued that the district court's decision was correct because Waller was merely a social guest without any standing to challenge the search and, alternatively, officers had apparent authority to search the entire premises, including the luggage bag.  Id.  The Court of Appeals reversed and remanded finding that Waller did have a reasonable expectation of privacy and that the officers did not have apparent authority.  Id. at 841.

In making its decision, the Court of Appeals analyzed each of the components explained above: an actual expectation of privacy, the reasonableness of the expectation, the existence of common authority, and the appearance of authority.  At the first step of the analysis, the court noted that Waller did not tell Howard or the other apartment occupants the bag's contents or give them authority to look in the bag and that the bag remained zipped, closed, and stored in the bedroom within a closet.  Id. at 844.  Based on these manifestations, the court found an actual expectation of

privacy.  Id.  At the second step, the court noted Waller's recent arrival at the apartment and that he was only using it for storage and showering.  Id.  On this basis, the court analogized Waller's luggage to carry-on luggage during travel and found the expectation of privacy to be reasonable.  Id. at 844-45 (citing Bond v. United States, 529 U.S. 334 (2000)).

The court found Howard's consent was not valid for the luggage bag because he did not have common authority, i.e. "mutual use of the property, and . . . generally . . . joint access or control for most purposes."  Waller, 426 F.3d at 845 (quoting United States v. Karo, 468 U.S. 705, 725-26 (1984)).  The court noted that Waller and Howard "held a mutual understanding that the luggage contained Waller's private personal effects," and, again, that Waller never gave permission to open the luggage.  Waller, 426 F.3d at 845.

Finally, the court considered Howard's apparent authority.  The court found that the circumstances presented to the officers made it unclear whether the luggage bag was subject to mutual use.  In making its decision to remand, the court relied heavily on the fact that Waller was taken into custody before the search began.  Id. at 847.  The court analogized Waller's being in custody to a similar factual scenario which had been presented in United States v. McCoy, 181 F.3d 105, 1999 WL 357749 (6th Cir. (Table) May 12, 1999).  The court explained that in McCoy it "determined that the agent could not justify searching McCoy's briefcase on the sole consent of the third-party renter because at the time that the agent requested consent to search he knew that, in addition to the named renter, McCoy and another person could have had 'a protected privacy interest' in the briefcase,"  Waller, 426 F.3d at 846, and concluded that similar ambiguity of ownership existed between Waller and Howard, id. at 848.  In addition, the court considered the fact that the luggage fell within the class of containers–such as, valises, suitcases, footlockers, and strong

boxes–that "historically command[s] a high degree of privacy." Id. at 848.

Based on the foregoing, the court made a final, telling observation about the officers' behavior:

> The facts in this case are clear: the police never expressed an interest in *Howard's* belongings in Howard's apartment. The very purpose of the police presence was to search for (presumably) illegal possessions of *Waller's*. Why would the police open the suitcase if they reasonably believed it belonged to Howard? The answer is that they would not have opened the bag. They opened the bag precisely because they believed it likely belonged to Waller.

Id. at 849 (emphasis in original). Based on the ambiguities presented to the officers and their failure to resolve the ambiguity, the court concluded that apparent authority did not excuse the warrantless entry and it was unlawful under the Fourth Amendment.

## A.     Actual Expectation of Privacy

The Court must first determine whether the defendant has an actual expectation of privacy in the closet or gun cabinet. King, 227 F.3d at 743. Looking at the facts of the present case, the Defendant had an actual expectation of privacy in the area to be searched.

According to Louise Sharp's testimony, at some prior point in time, she and Mack Sharp were able to access the closet. However, the evidence indicates that prior to the search on August 29, 2007, the Defendant eliminated Mack Sharp's access to the closet by placing a padlock on the closet door and retaining the only key to that lock. There is no evidence in the record to indicate that Mack Sharp felt at liberty to walk across the street and get the key to access the closet or even knew which key would open the closet. Officers opened the door by trial and error, and there was no testimony that Mack Sharp volunteered or had any knowledge of what key would open the closet's lock. The Defendant also had an actual expectation of privacy in the gun cabinet. In addition to the

foregoing restriction, access to the contents of the cabinet was further restricted by a second lock, and again, there is no evidence of record that Mack Sharp or anyone, other than the Defendant, had a key to that lock.

While the Court recognizes that the closet's location in Mack Sharp's home could indicate a diminished expectation of privacy, the Court finds that the Defendant, prior to the date of the search, had completely eliminated Mack Sharp's access to both the closet and the gun cabinet. Most likely this was done as a preventative measure due to Mack Sharp's deteriorating mental condition. The Defendant knew that despite Mack Sharp residing in and exercising dominion over most parts of the home, he could not access the contents of either the closet or the cabinet.

Comparing the present situation to the facts of <u>Waller</u>, the Court finds that the actual expectation of privacy in the present case is more compelling than that in <u>Waller</u>. In <u>Waller</u> there was an understanding that Howard, the primary occupant of the residence, would not access Waller's personal effects. However, there was no padlock keeping Howard out of the luggage; it was simply closed. Had Howard decided to open the luggage, he could have easily accessed its contents. In contrast, the Defendant's expectation of privacy in the present case is more clearly manifested because the closet was padlocked, Mack Sharp had no key, and short of taking the doors off their hinges or ramming the door down, Mack Sharp could not access the closet. <u>See</u> <u>Garcia v. Dykstra</u>, 260 Fed. Appx. 887, 897 (6th Cir. 2008) ("By placing the tools inside the storage unit and securing the unit with a padlock, plaintiffs demonstrated an intent to keep the contents of the unit 'free from public view.'") The possibility of Mack Sharp accessing the locked cabinet without a key were even lower, for obvious reasons including its location within the locked closet.

Based on the foregoing, the Court finds that the Defendant expressed an actual expectation of privacy in the contents of the closet and the gun cabinet.

**B.      Reasonableness of the Expectation of Privacy**

After finding an actual expectation of privacy, the Court is charged with determining whether the expectation is one that society is prepared to recognize as reasonable.  King, 227 F.3d at 743.  The Court recognizes that society might find the expectation of privacy presented in this case to be less than reasonable given that the closet and cabinet were located in the Defendant's father's home rather than his own.  However, a resident's consent to search his home is not necessarily consent to search closed containers within the home, Waller, 426 F.3d at 845; see United States v. Karo, 468 U.S. 705, 725-26 (1984) (O'Connor, J., concurring) ("A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home."), and in this case, the Defendant undertook significant measures–a padlock to which he held the only key–to ensure that the home's owner, Mack Sharp, could not access the closet or cabinet.  These measures also argue against construing the closet and the cabinet as shared or common spaces, in which a socially reasonable expectation of privacy is rarely found, see United States v. Dillard, 438 F.3d 675, 683 (6th Cir. 2006).

In the present case, the Defendant retained the only key to the closet and gun cabinet, and the evidence of record indicates that he excluded others, including Mack Sharp, from accessing the area, and he stored personal property in the closet and cabinet.  These facts demonstrate an objectively reasonable expectation of privacy.  See United States v. Gricco, 2002 WL 393115, *2 (E.D. Pa. 2002) ("A reasonable expectation of privacy exists in circumstances where an individual maintains the only key to an area, maintains exclusive control over the area and keeps personal and/or business

items there").  The Defendant excluded others from the place in question and had taken significant precautions to maintain his privacy; accordingly, the Court finds his expectation of privacy to be objectively reasonable and one which society would recognize.  See United States v. King, 227 F.3d 732, 744 (6th Cir. 2000).

## C.    Common Authority

The Court has completed its initial inquiry and determined that the Defendant had a legitimate expectation of privacy in the locked closet and gun cabinet, and thus, he may object to the search of such.  However, the Defendant in this case did not give consent to search the closet and gun cabinet.  Instead his father gave consent to search the closet and gun cabinet.  Thus, the Court must next examine whether Mack Sharp's consent to search was valid and served as an exception to the against warrantless searches.  Mack Sharp's consent can only serve as an exception to the rule against warrantless searches if: (a) he possessed the actual authority to give consent because he had common authority over the closet and gun cabinet through mutual use and joint access or (b) the facts available to the officers, at the time consent was given, would warrant a man of reasonable caution in the belief that Mack Sharp had authority over the premises.  Again, it is the Government's burden to establish that valid, or apparently valid, consent was obtained.  See McCauley, 548 F.3d at 446.

The Court will next examine the first of these two possibilities—whether Mack Sharp had common authority over the closet and cabinet.  Looking again to Waller and to other cases in this Circuit, the Court concludes that Mack Sharp did not have common authority over the closet or the cabinet.

While the Court acknowledges that guns in the closet once belonged to, or perhaps, in title only, continued to belong to, Mack Sharp, the testimony at the hearing and the facts of this case indicate that Mack Sharp no longer had access to the contents of the closet or the cabinet. All the evidence presented to the Court supported the conclusion that the Defendant possessed the only key to the closet and cabinet. In addition to not possessing the key, Mack Sharp did not indicate to officers that he had any knowledge of what key might open the closet and cabinet nor did he indicate that he ever accessed the closet and cabinet using the Defendant's keys. In fact, from Ms. Sharp's testimony at the hearing and the addition of padlock within a year of the search, it appears that very real efforts were being made to prevent Mack Sharp from accessing the closet or cabinet, due to his deteriorating health and the danger he might pose to himself and others were he able to access the firearms in the closet and cabinet.

As previously stated, a resident's consent to search his home is not necessarily consent to search a closed object within the home. Karo, 468 U.S. at 725. Instead, "[a] valid consent to search the closed container must come from one who has common authority over the effects sought to be inspected, one who has mutual use of the property, and one who generally has joint access or control for most purposes." Id. at 725-26. Further, relevant case law supports the Court's reliance on the lack of a key or knowledge of how to open the containers when determining whether common authority existed. See United States v. Ayoub, 498 F.3d 532, 539 (6th Cir. 2007) (adopting the district court's conclusion that possession of the key to a home is a strong indicia of authority); see also United States v. Chen, 629 F.Supp. 263, 270 (S.D.N.Y. 1986) (finding common authority in a locked safe in a closet where both parties had keys to the closet and knew the combination to the safe).

Applying these rules and case law to the facts described above, the Court concludes that Mack Sharp lacked common authority over the closet and gun cabinet. Mack Sharp was wholly without the ability to access the closet. He possessed neither the mutual use nor the joint access and control that support finding common authority, Karo, 468 U.S. at 725, and accordingly, the Court finds that Mack Sharp did not have the common authority to consent to a search of the closet and cabinet. Thus, any consent to search his home was not consent to search the locked closet and gun cabinet within his home.

**D.    Apparent Authority**

Because Mack Sharp lacked actual authority to consent to a search of the closet or cabinet, the Court must undertake a final inquiry and determine whether the officers at the scene could have relied on Mack Sharp's apparent authority to consent to a search of the closet and cabinet. The officers' reliance on Mack Sharp's consent would be constitutional if the facts available to the officers, at the time consent was given, would warrant a man of reasonable caution in the belief that Mack Sharp had authority over the premises. Jenkins, 92 F.3d at 436. However, as cautioned above, ambiguity will not be resolved in favor of the officers or the Government where the officers proceeded, despite the ambiguity, without making further inquiry into the situation. Waller, 426 F.3d at 846.

The Court finds that the facts of the apparent authority analysis in this case mirror those in Waller and, therefore, do not support finding apparent authority. Initially, the Court finds that Mack Sharp's statements to officers notified them of his inability to access the closet or cabinet. Further, the fact that he did not possess a key to either the closet or the cabinet and the fact that officers engaged in a trial and error use of keys rather than receiving Mack Sharp's assistance in finding and

using the correct keys, at best, demonstrate that officers were presented with an ambiguous situation. Despite this ambiguous situation, officers did not ask the Defendant who was in custody, either across the street or at an ACSD facility, for permission to search the closet and cabinet.

The choice to rely on the consent of an elderly man, who made it clear to officers he was not able to access the closet, rather than inquiring with the Defendant, invokes the motivations that were present in Waller. As in Waller, the officers here never expressed an interest in what *Mack Sharp* might have stored in the closet or cabinet. They were searching for the *Defendant's* possessions, and in fact, returned the items Mack Sharp identified as his own, whether correctly or incorrectly, to him. If officers believed that the closet was Mack Sharp's and contained his possessions, they never would have opened it or the cabinet. According to Sgt. Leinart and Det. Bowie, one of the officers' first questions upon arriving at Mack Sharp's was whether the Defendant stored firearms in the home, and Mack Sharp confirmed that he did. The officers knew that the Defendant was storing items in the closet and cabinet, and on that basis alone sought to open it. Based on the foregoing, this Court must conclude, as the Court of Appeals for the Sixth Circuit concluded in Waller, that "[d]eliberate ignorance of conclusive ownership . . . does not excuse the warrantless search . . . when actual ownership could have easily been confirmed." Waller, 426 F.3d at 838.

Because the circumstances presented here were sufficiently ambiguous to place a reasonable officer on notice of his or her obligation to make further inquiry prior to searching the closet and cabinet, the Court finds that the officers' warrantless entry into the closet and cabinet cannot be excused on the basis of apparent authority.

## V.    CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities, the Court finds that the Defendant had a legitimate expectation of privacy in the closet, the cabinet, and their contents.  The Court finds that Mack Sharp did not have common authority over the closet or cabinet, and further, apparent authority does not support the officers' warrantless entry because they failed to make sufficient inquiry when presented with an ambiguous situation.  As a result, the warrantless search of the closet and cabinet was unlawful under the Fourth Amendment of the United States Constitution, and the fruits of this search should be suppressed.

Therefore, it is **RECOMMENDED** that the Defendant's Third Motion to Suppress **[Doc. 57]** be **GRANTED**.[5]

Respectfully Submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).