UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:07-CR-124 |
| | ) | (VARLAN/SHIRLEY) |
| MICHAEL RODNEY SHARP, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. The case came before the undersigned on October 20, 2009, to address the Defendant's Motion to Suppress Statement [Doc. 89]. Assistant United States Attorney Tracy Stone was present representing the Government. Attorney Ralph Harwell and Attorney Jonathon Harwell were present representing the Defendant, who was also present.

The Defendant filed his motion on September 15, 2009, out of time. The Government filed a brief response on September 16, 2009, and on September 18, 2009, the Court briefly addressed the motion and its effect on the trial date in this matter which, at the time, was scheduled for September 22, 2009. The Court rescheduled the Defendant's trial for January 11, 2010, with a second setting of February 16, 2010, and an evidentiary hearing on the motion was set for October 20, 2009. On September 29, 2009, the Government supplemented its initial response to the Motion to Suppress. [Doc. 103]. At the hearing held October 20, 2009, the Court heard the evidence presented and the arguments of the parties on the motion. Thus, the Court took the motion under advisement on October 21, 2009.

# I.    FACTS

At the hearing, the Court heard from three witnesses: Detective Roger Day, Sergeant Jim Leinart, and Lieutenant David Bowie.  Their testimony was as follows:

## A.    Detective Roger Day

Detective Roger Day ("Det. Day") testified that he has been employed by the Anderson County Sheriff's Department ("ACSD") for seven years.  Det. Day stated that he had been in law enforcement for twelve years and that, at the ACSD, he specializes in narcotics investigations.  Det. Day confirmed that he recognized the Defendant.

Det. Day confirmed that he assisted in the execution of a search warrant on August 29, 2007, at the Defendant's house.  Det. Day explained that his role was to assist Det. Danny Bowie ("Det. Bowie") in the execution of the narcotics search warrant.  Det. Day said that guns were an item that officers always looked for when executing a search warrant, but the officers were specifically looking for drugs and money.  Det. Day recalled arriving at the Defendant's residence at 9:00 a.m., and he estimated that five or more officers were present.  Det. Day noted that Det. Bowie and Sergeant Jim Leinart ("Sgt. Leinart") were part of the team executing the warrant.

Det. Day said he went into the residence,[1] made contact with the Defendant by yelling "Mikey Sharp," and in substance, "We're here on a search warrant."  Det. Day said he was at the bottom of a stairwell that led to the Defendant's bedroom, and he told the Defendant to "come out."  Det. Day recalled announcing a couple of times.  Det. Day said he had been to the Defendant's home before and he knew a bedroom was at the top of the stairs.  Det. Day said that after he announced,

---

[1]Per Det. Day (p. 5 herein) and Sgt. Leinart (p. 13 herein), the Defendant's wife Leslie Sharp answered the door and let the officers into the house.

the Defendant appeared at the top of the stairs in his underwear but he put on a pair of pants. Det. Day said he walked the Defendant over to and asked him if he would mind having a seat at the dining room table and the Defendant agreed. Det. Day recalled the Defendant's wife, Leslie Sharp ("Ms. Sharp"), being present along with "a couple of kids." Det. Day stated that Det. Bowie eventually sat at the table, and Ms. Sharp sat on the couch in the living room.

Det. Day could not recall the Defendant being handcuffed and stated that he, personally, had not handcuffed the Defendant. Det. Day said he did not tell the Defendant that he was under arrest. Det. Day stated that there were other law enforcement officers in the room. He explained that the other officers were present "for officer safety," to prevent, for example, a suspect from grabbing a gun. Det. Day and Sgt. Leinart went upstairs to the bedroom to begin the search. Det. Day stated that the Defendant had been the only person in the bedroom, and the officers did not find anyone else in the room. Det. Day stated that officers found a loaded .22 pistol under the dresser in the bedroom.

Det. Day was presented with a photograph of the pistol lying under the dress, which was admitted into evidence as **Exhibit One**. Det. Day explained that the photograph of the pistol under the dresser, and he identified the hammer and barrel of the pistol in the picture. Det. Day was presented with a second photograph, which was admitted into evidence as **Exhibit 2**. Det. Day explained that the photograph showed the same pistol, which he described as an "older .22 pistol."[2] Det. Day explained that he and Sgt. Leinart took the photographs, and then, he took the gun and put it on the table where Det. Bowie was sitting. Det. Day said he gave the gun to Det. Bowie, which was standard procedure because it was Det. Bowie's case. Det. Day acknowledged that Det. Bowie

---

[2]The Government clarified that this .22 caliber revolver was the firearm identified in the Superseding Indictment as "an Omega, Model HS300, .22 caliber revolver."

was sitting at the table with the Defendant, but Det. Day said he sat the gun near where Det. Bowie was sitting and told him the gun was found under the dresser in the bedroom.

Det. Day denied having said anything at that time to the Defendant or having said anything later to the Defendant about the firearm. Det. Day recalled that the Defendant stated, out of the blue, that the gun belonged to his brother. Det. Day said no one responded to the comment. Det. Day said he was at the table for only about ten seconds and then went back to searching. Det. Day said he did not know if anyone else asked the Defendant about the gun, but all he heard was the comment from the Defendant: "that belongs to my brother."

Thereafter, Det. Day was presented with a report, which he recognized and noted he had drafted near the time of the August 29, 2007 search. AUSA Stone pointed out that the report said, Det. Day "went upstairs" and "brought him down." Det. Day responded that the phrasing was not completely accurate. Det. Day said he actually met the Defendant as the Defendant was coming down the stairs; Det. Day said he did not go all the way up to the bedroom and bring the Defendant downstairs. Det. Day said that he was in a hurry when he prepared the report and the report, at the time, was meant to log the fact that Det. Day had found the firearm. Det. Day confirmed that the report does not mention the Defendant saying anything about firearm after it was found. Det. Day explained that he did not think finding the firearm was an issue and that he was at the Defendant's home looking for drugs. However, Det. Day confirmed that he remembered the Defendant saying that the firearm belonged to his brother.

Det. Day recalled that someone from the ACSD had gone to get a second warrant on August 29, 2007, but he was not sure if it was Det. Bowie that had gone to get the warrant or not. Det. Day confirmed that at some point the Defendant was placed under arrest, and Det. Day estimated that this

would have been about three or four hours into the execution of the search warrant. Det. Day said that he did not recall the Defendant being placed in handcuffs at any time other than when he was formally arrested and taken to jail. Again, Det. Day confirmed that the Defendant was taken to jail "sometime," on August 29, 2007.

Det. Day recalled that, while the officers were executing the search warrant, the Defendant was allowed to get up and change the diaper of his baby. Det. Day said that officers would have been around while the Defendant was doing this. Det. Day did not remember the Defendant getting a drink or food while the officers were executing the search warrant.

On cross-examination, Det. Day confirmed that four or five officers arrived at the Defendant's house early in the morning, at approximately 9:00 a.m. Det. Day explained that Ms. Sharp opened the door and let the officers into the Defendant home. Det. Day confirmed that he knew Ms. Sharp and that the search warrant authorized officers to look for narcotics and marked bills that an informant had used to buy drugs the day before. Det. Day could not remember whether he was in uniform when the officers entered the home, but he noted that there were officers there who were in uniform. Det. Day confirmed that he and other officers at the home were armed and that they intended to secure the scene.

Det. Day confirmed that the stairway to the upstairs portion of the home was narrow. Det. Day stated that he had not been at the Defendant's home when a search warrant was executed in January 2007 and stated that he could not have confused the August 2007 events with the events of January 2007. Det. Day recalled that the first thing he did upon entering the house was to ask Leslie where the Defendant was and she responded that he was upstairs. Det. Day said he went to the stairs and yelled for the Defendant, several times, with the goal of having the Defendant come down the

stairs. Det. Day said that the Defendant appeared that the top of the stairs, and Det. Day recalled that, as the Defendant began to come down the stairs, he met him on the stairs.

Det. Day confirmed that in his report he had said that he and Sgt. Leinart went up to the bedroom. Det. Day said that he did not recall writing the statement on the day the search warrant was executed. He stated that he wrote it a "few days" afterward. Det. Day agreed that a receipt of the items taken from the home would have been prepared after the search, but he could not remember whether he took part in preparing the receipt. Det. Day said he did not know if the receipt contained any statements about the Defendant sleeping on the floor near the firearm. Det. Day reiterated that, when he first saw the Defendant, the Defendant was standing at the top of the stairway. Det. Day stated that he called to the Defendant several times and that, as a result of the Defendant's failure to respond, he probably made louder announcements to come down.

Det. Day confirmed that in his report he wrote, "Then I went upstairs and brought him down into the living room." Det. Day again stated that instead of going upstairs and bringing the Defendant down he met him on the stairway and escorted him down. Det. Day said he was not angry when he met the Defendant on the stairs. Det. Day stated that the Defendant had not responded to his announcements and orders for "over a minute." Det. Day said that the failure to respond concerned him, but it did not anger him.

Det. Day agreed that the stairway was narrow and agreed with Attorney Ralph Harwell's estimation that it was twenty to twenty-two (20-22) inches wide. Det. Day conceded that he and the Defendant were too large to walk down the stairs side-by-side and that instead he brought the Defendant down the stairs by walking in front of him. Det. Day said that when they got downstairs he sat the Defendant in the dining area of the kitchen. Det. Day agreed that the Defendant's house

is an open A-frame structure, without many walls. Det. Day said that the dining area was closer to the living room area than the kitchen area. He stated that as one comes through the front door, the kitchen table is immediately to the left and is close to the stairway.

Det. Day confirmed that when the Defendant was brought down the Defendant had on only his pants. Det. Day said he directed the Defendant to sit at the table, but Det. Day could not recall if Det. Bowie was sitting at the table at that time. Det. Day recalled saying to the Defendant, "If you don't care, just have a seat right here." Det. Day said he did not tell the Defendant that anything would happen to him if he did not sit at the table. Det. Day stated that the Defendant would not, for example, be free to go shopping and explained that he sat the Defendant at the table for safety reasons; Det. Day wanted to be able to see the Defendant. Det. Day agreed that his statement in his report that he went "back upstairs" after sitting the Defendant at the table was misleading, as he had not been upstairs before.

Det. Day confirmed that the upstairs bedroom had a dresser with a television, some storage on the right side of the room, and a bed to the right. Det. Day agreed that he began his search in this room. Det. Day again confirmed that the search warrant had originated from allegations of Ms. Sharp selling drugs the day before the search. Det. Day said no one told him the bedroom was the Defendant's room, and instead, he said he assumed it was both the Defendant and Ms. Sharp's room. Det. Day confirmed that there were a couple of bedrooms downstairs.

Det. Day agreed that the dresser, where the .22 pistol was found, was approximately four or five feet from where the Defendant was standing when Det. Day initially saw him. Det. Day denied talking to officers who had taken part in the January 2007 search about what had found around the dresser. A photograph of the pistol was taken before it was moved, but Det. Day could not

remember if he took the photograph or if Sgt. Leinart took the photograph. Det. Day agreed that the pistol was ultimately taken downstairs, but he said he searched for several more minutes and unloaded the gun before he took it downstairs. Det. Day said he had no idea what was happening to the Defendant while he was upstairs. Det. Day said that he did not know who the property in the bedroom belonged to and did not inquire about who owned it. Det. Day agreed that he was only interested in the firearm, which he took back downstairs.

Det. Day agreed that when he came back downstairs the Defendant was sitting at the table and, as he recalled, did not have his shirt on. Det. Day confirmed that Ms. Sharp was on the couch. Det. Day said that he was not sure what would have happened if the Defendant had gotten up and left. Det. Day said he was there to search the house, and the Defendant leaving would have been Det. Bowie's concern.

Det. Day said that he brought the gun down, laid it next to Det. Bowie, and said it was under the dresser in the bedroom. Det. Day confirmed that, without any prompting, the Defendant reported that the pistol belonged to his brother.[3] Det. Day said that he probably did not write down a note about the Defendant's statement, because he was not concerned with the weapon. Det. Day confirmed that he knew the Defendant was prohibited by law from possessing weapons. Det. Day said he knew that the firearm could be evidence of the Defendant breaking the law, but Det. Day confirmed that he did not report it. Det. Day testified that the Defendant's statement was made in Det. Bowie's presence, but he could not recall who else heard the statement. Det. Day said that after the search Sgt. Leinart said he heard the comment, but Det. Day could not recall when Sgt. Leinart

---

[3]Attorney Ralph Harwell noted that a brother of the Defendant has since passed away, to which Det. Day agreed that he knew that a brother of the Defendant had passed away but he did not know if that was the brother to whom the Defendant referred to in his statement.

told him that he had heard the comment.  He estimated that it had been shortly after the search warrant.

Det. Day again stated that he did not know if Det. Bowie or another person got a second search warrant.  Det Day said he remembered a representative from the District Attorney's office coming to the Defendant's home, while the search warrant was being executed.  Det. Day did not recall any mention of items being left in place until a second warrant was obtained, but Det. Day agreed that at some point the initial search stopped until a second search warrant was obtained.  Det. Day said he did not recall being shown the second search warrant.  Det. Day said that he did not know what the defendant was told he could do while officers were waiting on the second search warrant.  Det. Day said it was not his concern.  Det. Day said that either the Defendant or Ms. Sharp diapered their baby at some point during the search.

When again asked whether the Defendant could leave, Det. Day said it was not his call to make, but Det. Day agreed that if the Defendant had left he would have to go away from home, since the search was taking place at his home.  Det. Day confirmed that the Defendant was later taken from his home to the Anderson County Detention Facility.  Attorney Ralph Harwell presented a waiver of rights form that was later admitted into evidence as **Exhibit 3** to the hearing.  Det. Day identified the form as evidence that the Defendant advised of his rights and *mirandized* at the Anderson County Detention Facility, at 8:05 p.m. on August 29, 2007.  Det. Day confirmed that the Defendant's signature appeared at the bottom of the page.  Det. Day said he did not know if any questioning of the Defendant at the Detention Facility was recorded.  Det. Day said he did not participate in advising the Defendant of his rights.

Det. Day also could not remember whether he was present when the receipt was composed for the items that had been taken from the Defendant's home. Det. Day said the only thing that he knew of being laid out in front of the Defendant was the .22 pistol he found. Det. Day said he did not record any discussions with the Defendant at his house, and did not know if any other officer did. Other than Det. Bowie and Sgt. Leinart, Det. Day could not recall what other officers were present at the search. Det. Day again confirmed that Ms. Sharp was on the couch and said that she might have heard the Defendant's statements. Det. Day estimated that the couch was six to eight (6-8) feet from the table. Det. Day confirmed that there were children at the home at the time of the search. They were ultimately taken away, but Det. Day said they may have still been at the home at the time of the statement.

On redirect-examination, Det. Day agreed that the date of August 29, 2008, which appears in the report he prepared, is a typographical error. He stated that he was in a hurry that the year should have been "2007" not "2008." Again, Det. Day stated that the report was prepared a few days after the August 29, 2007, search.

Det. Day stated that on August 29, 2007, he did not know of any law enforcement officers having their weapons drawn on or near the Defendant. However, Det. Day conceded that he had his weapon drawn at one point when he was at the bottom of the staircase and the Defendant was at the top. Det. Day explained that he had his firearm in the "low-ready" position, which he agreed consisted of having his left-hand at the bottom of the weapon and the right hand holding the pistol which is pointed downward. Det. Day confirmed that his finger would not have been on the outside of the weapon not on the trigger. Det. Day said he was not in the position for very long, by his estimation, less than a minute. Det. Day said that assuming the "low-ready" position was standard

procedure in executing a search warrant. Det. Day explained that the position is taken because of officer safety concerns, specifically, not knowing who may be armed.

Det. Day said that he believed the Defendant saw the weapon in "low-ready" position, but Det. Day said he holstered the weapon when the Defendant came downstairs. Det. Day explained that he would have holstered the weapon, at that point, for the Defendant's safety, because he did not want to accidentally shoot the Defendant. Det. Day said that when he and the Defendant made it to the bottom of the stairs he patted-down the Defendant, took him to the table, and asked that he sit down. Det. Day said that after that time, he did not draw his weapon again or see any other officers with their weapons drawn.

Det. Day confirmed that, other than yelling to initially get the Defendant's attention and direct him downstairs, he did not yell or raise his voice to the Defendant. Det. Day said that the Defendant did not raise his voice and was never obstinate. Det. Day said the Defendant was friendly and the atmosphere while the search warrant was executed was friendly.

In reference to his conversation with Sgt. Leinart about the Defendant's comments , Det. Day said that he had a general conversation with Sgt. Leinart about the execution of the search warrant. Again, Det. Day said he did not have a time frame for the conversation other than that it happened shortly after the search warrant was executed. Det. Day stated that Det. Bowie would have been making the calls and in charge of the execution of the search warrant. Det. Day said that his understanding was that, from the time the Defendant was brought downstairs, Det. Bowie would be responsible for the Defendant.

On recross-examination, Det. Day said that he did not know what Det. Bowie and the Defendant were talking about prior to the pistol being laid on the table. When asked if the Defendant

had made a statement, "I ain't got no guns," Det. Day said that he was "pretty sure" the Defendant had made that statement. Det. Day said he did not know if anyone asked the Defendant about guns. Det. Day reiterated that he and the Defendant have always been friendly with one another and confirmed that the Defendant had never been violent toward him. Det. Day said he had heard stories that the Defendant was "a little rowdy in his younger days," but noted that he treated him just like everyone else in executing the warrant. Det. Day agreed that in warrant execution situations everyone is under the officers' dominion until the area is secured. Det. Day confirmed that until the are is secured persons in the area are not free to do anything other than follow the officers' instructions.

On a final redirect-examination, Det. Day agreed that his memory had been refreshed about the "I ain't got no guns" comment. Det. Day said that the comment would have been made after he brought the pistol down from upstairs and would have been later in the day, not immediately upon the firearm being placed on the table. Det. Day said that all he remembered being said at the time the firearm was placed on the table was the comment about his brother. Again, Det. Day said that he did not know of anyone talking to the Defendant in a way that would have caused him to make the statement.

## B.     Sergeant Jim Leinart

Sergeant Jim Leinart testified that he is a sergeant in the ACSD. Sgt. Leinart testified that he has been with the ACSD for fourteen (14) years and has been in law enforcement since 1988. Sgt. Leinart stated that he was at the Defendant's home on August 29, 2007, during the execution of the search warrant. Sgt. Leinart stated that his role in the search warrant execution was "sergeant in charge," but he said that the warrant was Det. Bowie's and not his. Sgt. Leinart explained that the

officer who writes the warrant "does everything" at the scene, but Sgt. Leinart said he supervises and is there in case the other officers need assistance.

Sgt. Leinart recalled arriving at the Defendant's home in the morning, but he could not remember the exact time. Sgt. Leinart said he believed that he, Det. Day, and Det. Bowie, and some other officers were the first to approach. Sgt. Leinart also said that Bill Breeden, and other patrol officers came up to help. Sgt. Leinart said that Ms. Sharp opened the door, and one of the officers told her why the officers were there. Sgt. Leinart said Ms. Sharp let the officers in the house and told them that the Defendant was upstairs in the bedroom. Sgt. Leinart said he and Det. Day yelled at the Defendant several times. Sgt. Leinart said that they finally got the Defendant's attention and he came downstairs. Sgt. Leinart said that they yelled to get the Defendant's attention.

Sgt. Leinart stated that, during the yelling, Det. Day was on the stairwell going up toward the bedroom, the only bedroom on the upper floor. Sgt. Leinart said he was approximately two steps behind Det. Day. Sgt. Leinart did not recall Det. Day going all the way to the top of the stairs. Sgt. Leinart estimated that Det. Day went three-quarters of the way up. Sgt. Leinart stated that when the Defendant stood up, he was in his underwear, and he stopped and put some blue jeans on before coming downstairs. Sgt. Leinart stated that he did not go to the top of the stairs at that point. Sgt. Leinart said he was not sure if Det. Day had a hand on the Defendant as he came down the stairs, but he said he believed Det. Day did not have a hand on the Defendant because of the narrow stairwell.

Sgt. Leinart said at that point the Defendant was taken to the table, and he sat with Det. Bowie. Sgt. Leinart did not recall if Det. Bowie was sitting at the table when the Defendant sat down, but Sgt. Leinart said Det. Bowie was in the kitchen area. Sgt. Leinart stated that the kitchen table is on one's left as they enter through the front door. Sgt. Leinart thought that Det. Day just

asked the Defendant to sit down.  Sgt. Leinart said he did not remember the words Det. Day used in asking the Defendant to be seated.  When asked whether the direction to sit down was assertive or suggestive, Sgt. Leinart recalled, "He just asked him to sit down."  Sgt. Leinart said that after the Defendant sat down, he and Det. Day went back upstairs to look for narcotics.

Turning back to the request to sit down, Sgt. Leinart explained that during the execution of a search warrant a subject is asked to sit or remain in a certain area to insure officer safety and keep the person under control.  Sgt. Leinart explained that officers want to "keep an eye on" the subject, so that the subject does not mess with evidence or pose a threat to officer safety.  Sgt. Leinart said he had never had any trouble out of the Defendant but was operating under standard procedure for executing a search warrant.

Sgt. Leinart reiterated that he and Det. Day went upstairs to begin the search.  Sgt. Leinart said he went back to the same bedroom but said that was the first time that day that he had been in the bedroom.  Sgt. Leinart described the bedroom as an A-frame room with a mattress in the floor, an open closet in the corner, a dresser, and a big screen television.  Sgt. Leinart said he was present when Det. Day found the .22 caliber pistol under the dresser.  Sgt. Leinart said that Det. Day pointed the gun out to Sgt. Leinart because Sgt. Leinart had the camera.  Sgt. Leinart said he came over to the dresser and took a photograph.  Sgt. Leinart confirmed that he had taken the photographs admitted into evidence as Exhibits 1 and 2.  Sgt. Leinart recalled that, after the photographs were taken, Det. Day emptied the gun, secured it, and took it downstairs.  Sgt. Leinart could not remember if he and Det. Day began searching again directly after finding the gun.

Sgt. Leinart said he also went downstairs with Det. Day to take the gun down.  Sgt. Leinart said that Det. Day put the gun on the table.  Sgt. Leinart said that at the time the firearm was laid on

14

the table, Det. Bowie, the Defendant, and possibly Ms. Sharp were at the table. Sgt. Leinart said Ms. Sharp was at least in the room at that time. Sgt. Leinart was sure that Det. Bowie and the Defendant were at the table. Sgt. Leinart did not remember where the gun was laid in proximity to Det. Bowie and the Defendant, but he noted that the table was small, four feet or so. Sgt. Leinart did not recall hearing anything being said when the firearm was laid on the table. Sgt. Leinart recalled the Defendant making a comment about the pistol being his brother's.

Sgt. Leinart also stated that later in the day, the Defendant told Sgt. Leinart that the pistol was his brother's and that he used it to shoot rats. Sgt. Leinart said he talked to the Defendant "several" times during the day the search warrant was executed.

Reviewing the two separate incidents, Sgt. Leinart agreed that in the first instance Det. Day sat the gun on the table and the Defendant made a comment about the gun belonging to his brother. Sgt. Leinart said that he did not ask the Defendant any questions at that time nor did Det. Day. Sgt. Leinart said he did not hear Det. Bowie ask any questions either. Sgt. Leinart noted that he and Det. Day had returned upstairs shortly after pointing the gun down to continue searching and any further comments would have been made to Det. Bowie.

Sgt. Leinart said the Defendant was not handcuffed when he was sitting with Det. Bowie. Sgt. Leinart said the Defendant was free to move about the house and noted that the officers let the Defendant get a drink and move around the kitchen area. Sgt. Leinart said that his descriptions of the Defendant moving around the house occurred after Sgt. Leinart was back downstairs from searching the upstairs bedroom. Sgt. Leinart said that if the Defendant had asked to go out on the porch he would have let him but agreed that an officer would have kept an eye on the Defendant, as long as he was on the property.

When asked whether the Defendant would have been allowed to leave before any evidence of drug activity had been found, Sgt. Leinart replied that officers would have kept him on the premises. Sgt. Leinart agreed that the Defendant was being detained.

Sgt. Leinart agreed that he had conversations with the Defendant throughout the day, and said that around lunch time, the Defendant was formally arrested, more specifically, around one or two o'clock in the afternoon. Sgt. Leinart said that the other conversations he described would have taken place before the Defendant was formally arrested. Sgt. Leinart said that, at some point, he was talking to the Defendant and he said, "the gun belonged to his brother and he used it to shoot rats."[4] Sgt. Leinart said the conversation probably took place somewhere other than the kitchen. As Sgt. Leinart recalled, he talked to the Defendant "about stolen vehicles and stolen TVs and different things," that had been found around the Defendant's property. Sgt. Leinart said he did not ask the Defendant about the gun and only recalled the Defendant mentioning the gun the one time. Sgt. Leinart said someone else might have been around during the second conversation, but he could not recall who it was.

Sgt. Leinart explained that the Defendant was walking around the house at the time of the later statement and was not in handcuffs at that point. Sgt. Leinart described the atmosphere during the execution of the search warrant by stating that everyone was talking because the officers have known the Defendant for several years. Sgt. Leinart described the environment as friendly, did not recall any problems or anyone getting upset, except the Defendant's sister who came to the home later in the day. Sgt. Leinart said the Defendant's wife was very cooperative.

---

[4]Sgt. Leinart's testimony did not clarify whether the term "he" referred to the Defendant or the Defendant's brother.

When asked about the inventory and its mention of where the Defendant was sleeping, Sgt. Leinart said that he knew that the mattress in the bedroom was four or five feet from the dresser that the gun was found beneath, but he did not know whether or not the Defendant was sleeping on that mattress. Sgt. Leinart said he was not sure why officers assumed the Defendant was asleep; he said he thought it was because the officers had to yell at him several times.

On cross-examination, Sgt. Leinart confirmed that the search was a narcotics search directed toward Ms. Sharp and under Sgt. Leinart's direction. Sgt. Leinart said that some of the officers on the scene answered to him, and other officers, like the patrol officers, answered to someone else. Sgt. Leinart confirmed that Det. Bowie and Det. Day work for and with him. Sgt. Leinart agreed that the search started around nine or ten in the morning, but it was interrupted when an officer went to get a second search warrant. Sgt. Leinart said he did not know the time at which the second search warrant was obtained, but he agreed that he was consulted on the decision to get a second search warrant. Sgt. Leinart agreed that the decision to get the second search warrant was partially motivated by the fact that the initial search warrant was directed toward narcotics not stolen property or firearms. Sgt. Leinart recalled leaving items in place until the second search warrant was obtained; he also remembered a person from the District Attorney's office coming to the property.

Sgt. Leinart agreed that at the time the second warrant was obtained, he and Det. Day had already found the weapon upstairs. Sgt. Leinart said they did not leave the gun where they found it waiting on the second search warrant but instead left it on the table, until it was receipted later that day. Sgt. Leinart said he did not participate in writing the receipt, but he said it was done under his supervision and dated August 29, 2007. Sgt. Leinart said he did not know of Det. Bowie having been anywhere that the Defendant was sleeping, because Det. Bowie did not go upstairs at that time.

17

Sgt. Leinart reiterated that Ms. Sharp had initally told the officers that the Defendant was upstairs and, thereafter, Det. Day started yelling for the Defendant to come downstairs. Sgt. Leinart said he was aware that the Defendant had thereafter written a report about the incident and agreed that the report was directed at Sgt. Leinart, as a supervisor. Sgt. Leinart agreed that the report said that he and Det. Day "went upstairs," but Sgt. Leinart said he did not correct the misstatement at the time because the report was not turned into him. Sgt. Leinart agreed that he was aware of how important documentation is in searches and arrests. Sgt. Leinart stated that he participated in the January 2007 search of the Defendant's home and conceded that in March 2008 he composed a report stating that he had *mirandized* the Defendant during the January 2007 search. Sgt. Leinart said he did not write down the Defendant's statements about the gun that he made during the August 2007 search warrant execution because his role was to look for narcotics. The statement was later admitted into evidence as **Exhibit 4**.

Sgt. Leinart said he could not remember whether Det. Day had his gun drawn when the officers first encountered the Defendant. Sgt. Leinart agreed that the Defendant had come from upstairs and that is where the gun was found. Sgt. Leinart also reiterated that he took the photographs of the gun. Sgt. Leinart stated that Det. Day went back downstairs and laid the gun near Det. Bowie not near the Defendant. Sgt. Leinart said that, at that time, the Defendant said, basically, "That is my brother's gun." Sgt. Leinart did not recall hearing the Defendant say, "I ain't got no guns," and Sgt. Leinart said he did not remember hearing any further statements from the Defendant about guns at that point.

Sgt. Leinart said that later he was asking the Defendant about stolen property, but Sgt. Leinart said he did not recall asking the Defendant about guns. Sgt. Leinart again said he did not remember

the "I ain't got no guns" comment, but said he remembered the Defendant making a comment about his brother shooting rats. Sgt. Leinart said the comment about shooting rats was not made in response to a question; the Defendant just mentioned it. Sgt. Leinart said the statement was that the .22 pistol belonged to his brother and he used it to shoot rats. Sgt. Leinart was not sure if there was only one .22 caliber pistol found that day. Sgt. Leinart said he knew that the Defendant was talking about the .22 caliber pistol found upstairs because it was the only gun that the officers had found at that point in the search. Sgt. Leinart said the pistol may have still been sitting at the table, but he was not sure because he and the Defendant were somewhere else when the Defendant made the statements. Sgt. Leinart noted that they talked in the garage, in the house, and at several different places. Sgt. Leinart said the Defendant had not been advised of his rights at that point.

## C.     Detective Danny Bowie

Detective Danny Bowie testified that he has been employed at the ACSD since 1994 and that he has been in law enforcement since 1991. Det. Bowie confirmed that on August 29, 2007, a search warrant was executed at the Defendant's home. Det. Bowie explained that the search warrant was for narcotics and money involved in the sale of narcotics. Det. Bowie confirmed that it was "his" warrant and that he had sworn out the affidavit in support of the warrant. Det. Bowie stated the probable cause for the warrant was based upon a narcotics sale by Ms. Sharp that had taken place in the Defendant's home the day before the search warrant execution. Det. Bowie recalled that the narcotic that had been sold was Oxycontin, but he did not remember how much money was exchanged. Det. Bowie noted that the money had been documented and included a fifty-dollar bill off of which officers had recorded the serial number.

Det. Bowie stated that he did not believe he was the first person through the door when the

execution of the search warrant began. Det. Bowie stated that his role during the search was to gather evidence and complete documentation and paperwork. Det. Bowie said he was not the only person searching, and he did not begin searching himself until later in the afternoon. Det. Bowie said he did not believe he did any searching before the second warrant was obtained. Det. Bowie said that he instead sat at the kitchen table and spoke to the Defendant and Ms. Sharp. Det. Bowie said he did not think that both the Defendant and Ms. Sharp were seated at the table at the same time. He could not recall who he spoke to first, but he stated that he did speak to both the Defendant and his wife. Det. Bowie estimated that he first spoke to the Defendant approximately thirty to forty minutes after the officers entered the home. Det. Bowie testified that at that time he located the fifty dollar bill that had been used the day before the purchase narcotics, in the Defendant's wallet. Det. Bowie said that he had a conversation with the Defendant regarding the fifty-dollar bill that had been marked as part of the controlled narcotics sell the day before.

Det. Bowie said that when officers initially entered the home, the Defendant was upstairs and Ms. Sharp was downstairs. Det. Bowie said both the Defendant and Ms. Sharp were brought into the kitchen area, along with the children, for officer safety. At that time, Det. Bowie said he and the Defendant sat at the kitchen table. Det. Bowie said he and the Defendant sat at the table, but they did not talk about anything except the fact that the officers had a warrant to search the home. Det. Bowie said he was at the table when the Defendant was brought to the table. Det. Bowie said that the Defendant was not forced to sit at the table. As Det. Bowie recalled, the Defendant was asked if "he would mind coming in and sitting down." Det. Bowie said he explained to the Defendant that the officers had a search warrant and told the Defendant what was happening.

Det. Bowie said the next noteworthy event of the morning, in his mind, was when the officers found the fifty-dollar bill that had been used in the narcotics sale, in the Defendant's wallet. Det. Bowie said the officers found the fifty-dollar bill after they found the gun. Det. Bowie recalled Det. Day bringing the gun down and putting it down. Det. Bowie said that for a short time Det. Day and Sgt. Leinart were searching upstairs, and after a little while, Det. Day came downstairs and placed the gun on the table. Det. Bowie said that he believed when Det. Day brought the gun down he told Det. Bowie where it had been found. Det. Bowie did not remember responding and did not remember Det. Day saying anything to the Defendant.

Det. Bowie said he did not recall the Defendant saying anything about the gun. Det. Bowie said he was aware that other officers recalled the Defendant making a statement. However, Det. Bowie said that he personally did not remember the Defendant making a statement. Det. Bowie agreed that he was not testifying that the Defendant did or did not make a statement, just that he did not remember a statement. Det. Bowie said he did not recall the Defendant making a statement about his brother in relation to the gun. Det. Bowie reiterated that he did not ask the Defendant any questions when the gun was laid on the table. Det. Bowie explained that the Defendant had guns in his house in the past, and Det. Bowie said he just assumed the gun was the Defendant's. Det. Bowie again confirmed that he did not ask the Defendant any questions and the Defendant did not make any statements to Det. Bowie about that gun. Det. Bowie testified that the Defendant did not make any statements to him about the gun at any point during the day.

Det. Bowie stated that the Defendant was not handcuffed when Det. Bowie and he were discussing the search warrant, but Det. Bowie confirmed that, at that time, the Defendant was under his authority. To ensure the officers' safety, Det. Bowie said that he needed to know where the

Defendant, Ms. Sharp, and their children were. Det. Bowie testified that the Defendant walked around the home and helped with Ms. Sharp with the children. Det. Bowie recalled that Ms. Sharp asked if she could change clothes, and the officers allowed her to change.

Det. Bowie confirmed that he was present at the execution of a search warrant at the Defendant's home in January 2007. Det. Bowie also confirmed that firearms were found in the Defendant's home during that search, but he said the Defendant was not arrested for having the guns in his house in January 2007. Det. Bowie said that, at the August 2007 search, he would not have arrested the Defendant for having a gun in the house that day either. Det. Bowie said he would have instead taken possession of the firearm and spoken to someone at the ATF; Det. Bowie confirmed that was the course of action he had taken in the past when firearms were discovered at the Defendant's home.

Again, Det. Bowie confirmed that he did not hear the Defendant make any comments about the gun in question. Det. Bowie also confirmed that the Defendant was in his charge at that point in the day. Det. Bowie reiterated that the Defendant was allowed to get up and care for his children, but he remained within the officers' view. Det. Bowie confirmed that the Defendant never went outside, but Det. Bowie said that, if the Defendant had asked to go outside, he would have been allowed to go.

When asked if he would have allowed the Defendant to go to the store, for example, Det. Bowie said that his concern was officer safety, and the officers had no reason to keep the Defendant at the residence. Det. Bowie admitted that he was not faced with a situation where the Defendant asked to leave, but Det. Bowie said that if the Defendant had asked, he would have let him leave the residence because the search warrant was for the residence and the Defendant had the right to leave

at anytime. Det. Bowie said that after the fifty-dollar bill was discovered in the Defendant's wallet he now longer had the right to leave.

Det. Bowie identified Sgt. Leinart as the ranking officer at the execution of the search warrant. Det. Bowie explained that if the Defendant wanted to leave to go to the store, for example, and there was a disagreement between Det. Bowie and Sgt. Leinart about whether he could go, Sgt. Leinart's perspective would win out.

Returning to the discussion of the fifty-dollar bill, Det. Bowie said that the bill was found in the Defendant's wallet. Det. Bowie confirmed that the bill had been in the "buy-money" from the controlled purchase the day before. Det. Bowie said that, at that point, he decided to arrest the Defendant. Det. Bowie explained that he asked the Defendant about the fifty-dollar bill. The Defendant replied that it came from his wife and said that he did not know anything about it. Det. Bowie explained that the Defendant was then arrested. Det. Bowie estimated that this exchange and the arrest took place sometime in the early afternoon. Det. Bowie confirmed that at that point the Defendant was handcuffed. Det. Bowie stated that someone else transported the Defendant to the Anderson County Detention Facility. Det. Bowie confirmed that at the time the Defendant was handcuffed, the Defendant was no longer at liberty to walk around the house.

Det. Bowie confirmed that on the same day or the next day the Defendant was charged with a narcotics offense. Det. Bowie said that he did not charge the Defendant, on that day or any other day, with a state firearms charge. Det. Bowie testified that he questioned the Defendant about possession of firearms later that evening at the jail. Det. Bowie stated that the interview at the detention facility was recorded.

Turning back to the period before the arrest, Det. Bowie described the atmosphere in the residence as cooperative. Det. Bowie explained that the Defendant's wife, Ms. Sharp, has always been cooperative. Det. Bowie said that the Defendant and Ms. Sharp did not smirk or smart-off and noted that the Defendant handled himself well.

On cross-examination, Det. Bowie confirmed that he has known the Defendant for a long time. Det. Bowie agreed that the Defendant has never smarted off, challenged, or threatened an officer or tried to leave or destroy evidence. Det. Bowie said he believed Ms. Sharp let the officers into the residence. Det. Bowie confirmed that there were several officers at the Defendant's home to execute the search warrant, and Det. Bowie said he had the search warrant in his hand at the time of the execution. Det. Bowie agreed that once the officers were inside it was necessary to secure the residence and the persons inside. Det. Bowie agreed that Det. Day yelled up the stairs. Det. Bowie said he knew both the Defendant and his wife were asleep, but Det. Bowie said he did not know how insistent Det. Day was in his yelling. Det. Bowie said he would describe Det. Day's tone as normal.

Det. Bowie confirmed that he was armed when the search warrant was executed, and Det. Bowie said that, as far as he knew, all of the officers at the Defendant's residence were armed. Det. Bowie testified that the firearms would have been visible on the officers' persons. Det. Bowie said that he did not know of anyone pulling their weapon during the execution of the search warrant. Det. Bowie said he did not think that any of the officers had reason to pull their weapons.

Det. Bowie testified that Det. Day and Sgt. Leinart brought the Defendant down from upstairs. Det. Bowie agreed that it took a few minutes to get the Defendant to come downstairs because he was asleep. Det. Bowie said he did not remember Det. Day's firearm being out of its holster when they came down. Det. Bowie confirmed that when they came down the Defendant was

asked to sit at the table and that Det. Bowie himself sat at the table.  When asked again whether the Defendant, for example, could leave to go to the store, Det. Bowie responded the Defendant was to be patted down but since the officers just had a search warrant, not an arrest warrant, the Defendant was free to leave.  Det. Bowie said that the Defendant was not told to sit at the table; instead, he was asked to sit at the table.  Det. Bowie did not recall using 'please' or 'thank you' when asking the Defendant to sit down, but he said the interaction was like all his other interaction with the Defendant and had been polite.  Det. Bowie said that, in his opinion, the Defendant would have known that he had an option other than sitting at the table.

Det. Bowie confirmed that he was sitting at the table.  Det. Bowie said that, if there was anyone else sitting at the table, he could not remember who it was.  Det. Bowie testified that both he and the Defendant were sitting at the table at the time Det. Day brought the gun down and sat it on the table.  Det. Bowie said that Det. Day brought the gun down before the marked money was found in the wallet.  Det. Bowie confirmed that the Defendant was arrested and taken to the jail, early in the afternoon.  Det. Bowie said Ms. Sharp and the children were also taken into custody and were taken to juvenile court.  Det. Bowie said that the rights waiver would have been signed at 8:05 p.m.

Det. Bowie confirmed that at some point the officers stopped searching and he went to get another search warrant.  Det. Bowie testified that at the time the searching stopped the firearm had already been recovered.  Det. Bowie said that the Defendant may have already gone into custody at the time Det. Bowie left to get the second warrant.  When asked whether the second warrant was signed at 10:54 a.m., Det. Bowie responded that he did not know if that was when it was signed.  Det. Bowie stated that the Defendant was free to leave at any time in the same way that he was free

to return home while officers were still executing the second search warrant later that same night.

On redirect-examination, Det. Bowie explained that both the Defendant and his wife placed bonds and returned to their residence that night. Det. Bowie said he was contacted at his home in the early morning hours by officers, who were watching the residence and asked whether they should interfere with the Defendant and Ms. Sharp coming home. Det. Bowie said that the Defendant and his wife had the right to come back home.

## II. FINDINGS OF FACT

Based upon the testimony at hearing, the parties' memoranda, and the Court's review of the exhibits presented at the hearing, the Court finds the following facts:

On August 27, 2009, Det. Day, Sgt. Leinart, Det. Bowie, and other ACSD deputies and officers assisted in the execution of a search warrant at the Defendant's residence. The officers arrived at the Defendant's residence at approximately 9:00 a.m. The Defendant's wife answered the door and allowed the officers to enter the house. At the time the officers entered, the Defendant was asleep in an upstairs bedroom. Det. Day and Sgt. Leinart approached the stairs leading up to the bedroom, while Det. Day announced their presence and called for the Defendant to come down. Det. Day had his service firearm in a "low-ready" position. The officers approached the stairs and Det. Day continued to announce the officers' presence and instruct the Defendant to come down.

As Det. Day and Sgt. Leinart made their way up the stairs, but before they made it to the top of the stairs, the Defendant appeared at the top of the stairs. The Defendant appeared approximately a minute after the officers entered the home. The Defendant was in his underwear; he was allowed to return to the bedroom briefly to put on pants. Thereafter, Det. Day led him downstairs to the kitchen table and asked the Defendant to have a seat. Det. Bowie was sitting at the table at that time.

Ms. Sharp was nearby in the living room or kitchen area at the time. The Defendant sat at the table while Det. Day and Sgt. Leinart went to the upstairs bedroom and searched. Det. Day located a .22 caliber pistol under the dresser in the bedroom. Det. Day informed Sgt. Leinart that he had found the firearm, and Sgt. Leinart took a photograph of the pistol both as it was found and took another photograph of the pistol on top of the dresser. Then, Det. Day took the pistol downstairs and laid it on the table where Det. Bowie and the Defendant were seated. Neither Det. Day nor Det. Bowie asked the Defendant about the firearm. Shortly thereafter, the Defendant made a statement that the firearm belonged to his brother.

Officers continued to search the Defendant's residence. The officers decided that an additional search warrant was needed because the original search warrant was limited to searching for narcotics and money related to the narcotics trade. At approximately 11:00 a.m., a judge from the Anderson County Juvenile Court signed a second search warrant for the Defendant's home, which empowered officers to look specifically for stolen goods.

Later, Sgt. Leinart and the Defendant walked around the Defendant's property conversing about the search. Sgt. Leinart asked the Defendant about stolen property, and at some point prior to the Defendant being arrested, the Defendant made a statement that the gun belonged to his brother, who used it to shoot rats. Based upon the facts know to the Defendant and the officers at the time of this statement, it is implied that this statement referred to the .22 caliber pistol found in the upstairs bedroom.

Thereafter, officers searched the Defendant's wallet and found a fifty-dollar bill that had been marked as part of the controlled buy that took place the previous day. At that point, officers handcuffed the Defendant, and he was placed under arrest. He was then taken to the Anderson

County Detention Facility, where he was advised of his <u>Miranda</u> rights and questioned at approximately 8:00 p.m.  After posting a bond, the Defendant and his wife returned to their home later that same night.

## III.    ANALYSIS

The Fifth Amendment of the United States Constitution protects citizens against being "compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  To facilitate this protection, <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), requires law-enforcement officers to give warnings, including the right to remain silent, before interrogating individuals, who are "in custody."  <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994).  "In drawing the line between a non-custodial encounter between a citizen and the police (where <u>Miranda</u> does not apply) and a custodial encounter (where it does), courts consider 'all of the circumstances' surrounding the encounter, with 'the ultimate inquiry' turning on whether 'a formal arrest' occurred or whether there was a 'restraint on freedom of movement of the degree associated with a formal arrest.'"  <u>United States v. Panak</u>, 552 F.3d 462, 465 (6th Cir. 2009) (quoting <u>Stansbury</u>, 511 U.S. at 322).  Several factors guide the inquiry into whether a defendant was in custody: the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told he or she need not answer the questions. <u>Panak</u>, 552 F.3d at 465 (citing <u>United States v. Swanson</u>, 341 F.3d 524, 529 (6th Cir. 2003)).

As the Court of Appeals for the Sixth Circuit has explained, applying these factors "an in-home encounter between the police and a citizen generally will be non-custodial."  <u>Panak</u>, 552 F.3d 466.  This general rule relies upon the familiarity of the surroundings and the lessened risk that an

interviewee will be subjugated to the will of the interviewer in their own home. Id. Nonetheless, "[t]he number of officers, the show of authority, the conspicuous display of drawn weapons, the nature of the questioning all may transform one's castle into an interrogation cell—turning an inherently comfortable and familiar environment into one that a reasonable person would perceive as unduly hostile, coercive and freedom-restraining." Id. Thus, under certain circumstances, a suspect may be in custody for purposes of Miranda when in his or her own home.

Even if the Court finds that the Defendant was in custody, the duty to warn under Miranda arises only where the defendant is subjected to "express questioning or its functional equivalent." United States v. Murphy, 107 F.3d 1199, 1204 (6th Cir. 1997) (quoting Rhode Island v. Innis, 446 U.S. 291, 300 (1980)). Thus, "where a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statements are admissible despite the absence of Miranda warnings." Murphy, 107 F.3d at 1204 (citing United States v. Montano, 613 F.2d 147, 149 (6th Cir. 1980)).

With these standards in mind, the Court turns to the statements at issue in the present case.

A.     **The Statements Made at the Table**

The Defendant is alleged to have made a statement about his brother owning the gun found by Det. Day, while sitting at his kitchen table with Det. Bowie. In addition, counsel for the Defendant has, at least, alluded to the Defendant having also stated that he "ain't got no guns," while sitting at the table. This statement was referenced in Det. Day's cross-examination. The Defendant maintains that he was subjected to a custodial interrogation without being advised of his Miranda rights, and on this basis, he moves the Court to suppress the statements made at the table. The Government maintains that the Defendant was not in custody or subjected to interrogation.

For the reasons more fully explained below, the Court finds that the Defendant was not in custody and was not being subjected to interrogation when he made statements while seated at his table shortly after the officers' entry. Therefore, the Court finds no <u>Miranda</u> warnings were required, and the Court finds that suppression of the statements is not warranted.

As previously noted, the Defendant's wife answered the door when the officers came to the home to execute the search warrant, and she allowed the officers to enter without objection. It appears the Defendant was awoken from his sleep by the officers yelling that they had a search warrant and were present in the home to execute the search warrant. The officers had previous experience and familiarity with the Defendant's residence and moved toward his bedroom in an attempt to gather the home's residents before beginning their search. Det. Day took the lead in getting the Defendant to come downstairs.

Det. Day testified that his weapon was in the "low-ready" position as he called to the Defendant, and he testified that he did not make it all the way to the top of the staircase before the Defendant came to the doorway. Sgt. Leinart testified to the same, and stated that Det. Day only went approximately three-quarters of the way up the staircase before the Defendant appeared at the doorway. Though Det. Day appears to have prepared his summary of the search in haste, his mis-phrasing of the events does not undermine his and Sgt. Leinart's testimony. Similarly, the receipt of the items recovered in the search employs conjuncture in stating that the Defendant was asleep on the mattress. However, this inaccuracy does not undermine Sgt. Leinart and Det. Day's direct testimony that the Defendant appeared at the top of the staircase before the officers reached the top of the staircase.

30

Det. Day and Sgt. Leinart testified that the Defendant was allowed to retrieve a pair of pants and was then escorted down the stairs. Det. Day's uncontroverted testimony was that he put his weapon away at the time the Defendant appeared, unarmed, at the top of the staircase and that, due to the slim width of the staircase, he merely walked in front of the Defendant when escorting the Defendant downstairs. All of the officers testified that the Defendant was asked, and not directed, to sit at the kitchen table and that he did so. Both Det. Day and Sgt. Leinart testified that the Defendant was allowed to tend to his children, at least to a degree, and all of the officers testified that the Defendant was not handcuffed until he was actually placed under arrest.

The only actual point of variation in the officers' testimony was on the hypotheticals about whether the Defendant would have been allowed to leave or, for example, go to the store. On this point, the Court notes that a custody determination is based upon the circumstances at the time not the subjective views of either the officers or the suspect. See Stansbury, 511 U.S. at 323 ("[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.")

While an officers' belief that a defendant is not free to leave may be relevant if conveyed to the defendant, id. at 325, the testimony before the Court indicates that the Defendant never asked to leave, nor was he told that he could not leave his home. In sum, there is no indication that the officers' views or beliefs, specifically, Det. Day and Sgt. Leinart's view that the Defendant would not be allowed to leave, were ever manifested to the Defendant. Further, all of the testimony indicated that Det. Bowie, while not the ranking officer on the scene, was in-charge of the search operation and warrant execution, and Det. Bowie stated that because the officers did not have a warrant for the Defendant's arrest, the Defendant would have been allowed to leave the home at will.

Thus, applying the factors outlined by the Court of Appeals for the Sixth Circuit, the Court finds that the Defendant was not in custody for the purposes of <u>Miranda</u> at the time the statements were made at his kitchen table. The interview took place at the Defendant's home, a familiar environment, which by all accounts remained respectful and cordial during the execution of the search warrant. While Det. Day stated that he had his weapon drawn briefly, the weapon was holstered almost immediately upon the Defendant's entry into the living space. Approximately five officers were on the scene at the time of the statements, but there is no indication that they were gathered around so as to intimidate the Defendant. Nor is there any indication that the officers acted in a fashion that was meant to demonstrate authority. In fact, the Defendant and his wife were allowed to tend their children, and all testimony in the record indicates that the Defendant possessed unrestrained freedom of movement during the interview. The Court finds that these circumstances simply cannot be classified as an instance in which the officers commandeered the Defendant's home in a manner which is equivalent to him being in custody.

Thus, based on the foregoing, the Court finds that the Defendant was not in custody when he made statement(s) while seated at his kitchen table. The circumstances surrounding the encounter demonstrate that the Defendant was never subjected to restraint on his freedom of movement of the degree associated with a formal arrest, <u>Panak</u>, 552 F.3d at 465 (quoting <u>Stansbury</u>, 511 U.S. at 322), and therefore, the Defendant was not in custody for <u>Miranda</u> purposes.

Further, the Court finds that the Defendant was not subjected to interrogation or its functional equivalent. All of the officers' testimony indicated that Det. Day, pursuant to standard operating procedure, found a firearm, unloaded it, gave it to the supervising officer and told him where it had been found. The Defendant's statement about the firearm, was spontaneous and volunteered and was

not made in response to any question.

Thus, <u>Miranda</u> warnings were not required, and any statements made by the Defendant are admissible despite the lack of <u>Miranda</u> warnings. Det. Day knew that the Defendant was a felon, and the Defendant would have known, at least to a degree, that the officers were familiar with his criminal record. Nonetheless, the Court finds, that in this case, under these facts, putting a gun down, in front of Det. Bowie, is not tantamount to questioning, nor is it likely to elicit an incriminating response, nor does it rise to the level of provocation required of non-verbal questioning equivalents, like the Christian burial speech employed in <u>Nix v. Williams</u>, 467 U.S. 431 (1984).

The Defendant has cited the Court to a number of cases, which he proposes are analogous to the present case. First, in <u>United States v. Kim</u>, 292 F.3d 969 (9th Cir. 2002), the Court of Appeals for the Ninth Circuit held that the defendant was in custody in her own pharmaceutical shop. However, <u>Kim</u> is distinguishable from the present case on its fact and is further distinguishable in that it applies the case law of the Ninth Circuit. The defendant in <u>Kim</u> was detained for a period and then questioned for at least fifty minutes. <u>Id.</u> Despite her limited knowledge of the English language, at least thirty minutes of this questioning occurred before an interpreter arrived. <u>Id.</u> at 977. Further, her husband, who had arrived on the scene with her, was locked outside the shop and she was isolated from her teen-age son. <u>Id.</u>

In contrast, the Defendant in the present matter, at the time he made the statement, was friendly with and knew the officers in his home, had a command of the language being used, had not been directly questioned, let alone, been questioned for fifty minutes, and the Defendant was not isolated from his family. <u>Kim</u> is neither analogous to the present case nor persuasive in the Court's current analysis.

The Defendant also cites the Court to <u>United States v. Rith</u>, 164 F.3d 1323 (10th Cir. 1999), a case in which the Court of Appeals for the Tenth Circuit affirmed a lower court's determination that a defendant was in custody at the point at which he was presented with an illegal shotgun. <u>Id.</u> at 1332. In <u>Rith</u>, officers were given permission to enter the residence at which the defendant resided by the defendant's parents, who feared he had brought firearms into the home. <u>Id.</u> at 1327. The officers asked the defendant to sit at the kitchen table and told him that they wanted to speak to him. <u>Id.</u> at 1331. A detective specifically told the defendant that he "knew that [the defendant] had brought some illegal guns into the house," and told the defendant that the police had permission to search the home for guns. <u>Id.</u> The same detective asked the defendant where the guns were, to which the defendant responded that he only had one gun and that it was under his mattress. <u>Id.</u> Thereafter, "officers returned to the kitchen and confronted [the defendant] with the sawed-off shotgun," and prior to advising the defendant of his <u>Miranda</u> rights, the same detective asked the defendant whether he knew that possession of an illegal sawed-off shotgun was a federal offense," to which the defendant responded in the affirmative. <u>Id.</u> at 1331-32.

In <u>Rith</u>, the Court of Appeals agreed with the lower court's conclusion that the defendant was not in police custody until he was confronted with the illegal shotgun. The Court noted that the officers did not draw their weapons, handcuff Rith, or otherwise physically restrain the defendant. <u>Id.</u> at 1332. The Court of Appeals classified the detective's questions as "not harassing or especially prolonged." <u>Id.</u> The court noted that the defendant was not told that he did not have to answer questions and that there were five officers present in the home. <u>Id.</u> Based on these circumstances, the court reasoned that a reasonable person in Rith's position would have felt he or she was free to leave up until confronted with the illegal firearm.

A number of the facts in Rith mirror the facts of the instant case—for example, the number of officers present, the defendant being asked to sit at a certain location, and the officers locating a firearm. However, in whole, the Court finds that the present case is distinguishable from Rith. In Rith, the officers entered the Defendant's home with the purpose of finding firearms, and the officers told the defendant that they were there to look for illegal firearms. Id. The officers asked specifically where the illegal firearms were located, and after the defendant told them where the firearm was located, the defendant was presented with the sawed-off shotgun, which the defendant knew it was illegal to possess. Id.

In contrast, the Defendant in this matter was told that the officers were at his home to look for drugs, based upon a sale of narcotics his wife was alleged to have made the night before. The Defendant was not confronted with an allegation of illegally possessing weapons, nor did he admit to possessing a firearm by telling the officers where the pistol was located. In Rith the officers' previous expressions of suspicion about illegal firearms and the defendant's admission about where the gun was were combined with the actual presentation of the gun, in what amounted to a "the cat is out of the bag" scenario, tantamount to interrogation. In the present case, there was no combination of events that made the presentation of the gun tantamount to interrogation, and the Defendant's decision to explain that the gun belonged to his brother was a voluntary statement, not subject to the Miranda requirements.

Finally, the Defendant has cited the Court to United States v. Revels, 510 F.3d 1269 (10th Cir. 2007), a case in which the Court of Appeals analyzed only the issue of custody not interrogation, id. at 1270. In Revels, seven officers knocked down the door to the defendant's residence at 6:00 a.m. Id. The officers immediately handcuffed the defendant, and left her lying in the living room

floor face-down in her underwear for approximately ten minutes. <u>Id.</u> at 1271. Thereafter, the defendant's handcuffs were removed, she was allowed to feed her child, and dress. <u>Id.</u> The officers then separated the defendant from her live-in companion and children, and she was escorted to a back bedroom. <u>Id.</u> Three officers accompanied her and closed the bedroom door behind them. <u>Id.</u> No weapons were drawn. <u>Id.</u>

Again, the Court finds this case to be distinguishable from the instant matter. The Defendant was not aroused by his door being broken down in the very early morning, nor was he ever handcuffed, or ever truly in the officers' presence in his underwear. There is no evidence that the Defendant was separated from his family or closed-off in a confined room with numerous officers. The Court finds <u>Revels</u> to be neither instructive or persuasive in the present case.

In contrast, the Government cites the Court to an arguably analogous case, <u>United States v. Smith</u>, 285 Fed. App'x 209 (6th Cir. 2008). In <u>Smith</u>, the Detroit Police Narcotics Enforcement Unit executed a search warrant. <u>Id.</u> at 211. The officers found evidence that narcotics were being prepared for distribution in the front room of the home and also found a revolver under a shirt in the same room. <u>Id.</u> One of the home's residents, in response to seeing the recovery of the gun, explained to an officer that it was there because the house had been robbed a few days before. <u>Id.</u> During cross-examination, the officer conceded that this statement was not included in his incident report. <u>Id.</u>

Applying the <u>Innis</u> standard, the Court of Appeals for the Sixth Circuit reasoned that the defendant in <u>Smith</u> had not made the statement at issue in response to the functional equivalent of an interrogation. Instead it was made in response to the "mere discovery" of the weapon. The Court of Appeals reasoned that the statement was not made under conditions that "the police should know

are reasonably likely to elicit an incriminating response," but was instead made under circumstances "normally attendant to arrest and custody." Id. at 214 (quoting Innis, 446 US at 301).

In the present matter , while the weapon was placed in the Defendant's purview after it was discovered, the Court finds that the present case presents a situation in which the defendant responded to the "mere discovery" of the weapon under the circumstances "normally attendant to arrest and custody." Innis, 446 US at 301. Smith is both factually analogous to the present case and is authority within this circuit. The Court finds its analysis applicable to the present case, and following its analysis, the Court finds that the Defendant was not interrogated and no Miranda warnings were required.

In sum, the Court finds that, at the time he made the statements at the table including a statement about his brother owning the .22 caliber pistol, the Defendant was not in custody. The Court also concludes that the Defendant was not subjected to interrogation or its functional equivalent. Accordingly, the Court finds that Miranda warnings were not required and the officers' failure to make such warnings do not warrant suppression of the statements at issue.

**B.      The Statement Made to Sgt. Leinart**

The testimony from the hearing indicates that the Defendant made a statement about using the .22 caliber pistol to shoot rats to Sgt. Leinart. It appears this second statement was made at a later time, when the Defendant and Sgt. Leinart were engaged in conversation. The Defendant maintains that this statement should also be suppressed based upon the officers' failure to advise the Defendant of his Miranda rights. The Government maintains that the Defendant was neither in custody nor subjected to interrogation, and therefore, suppression is not warranted.

For the reasons more fully explained below, the Court finds that the Defendant was not in custody and was not being subjected to interrogation when he made statements to Sgt. Leinart. Therefore, the Court finds no <u>Miranda</u> warnings were required, and the statements made by the Defendant are admissible.

The facts and testimony pertinent to the analysis of the admissibility of these later statements are, in large part, those outlined above. Beyond the facts considered above, the testimony at the hearing provided little clarification about the exact conversation that took place between Sgt. Leinart and the Defendant. Specifically, the additional information Sgt. Leinart provided was that: he and the Defendant talked "at some point in time . . . ;" the Defendant said the pistol "belonged to his brother and he used it to shoot rats;"[5] and the conversation "probably" took place "somewhere else walking around." [Doc. 109 at 75]. Sgt. Leinart said he "talked to [the Defendant] about stolen vehicles and stolen TVs and different things" found on the premises, but Sgt. Leinart maintained he did not ask about the gun. [Doc. 109 at 75].

As more fully explained above, the Defendant was not in custody for the purposes of <u>Miranda</u> at the onset of the search or shortly after the officers entered the Defendant's home. The Defendant remained at his residence, a familiar environment, and the interaction between the officers and the Defendant was non-confrontational and cooperative. The testimony regarding the conversation with Sgt. Leinart indicates that he was even less constrained at the time of the conversation. There is no indication that, at the time of the conversation, the Defendant was around any officer other than Sgt. Leinart, or that his freedom of movement was being constrained. There is no indication that the Defendant was told at any point between the officers' entry and the conversation with Sgt. Leinart

---

[5]<u>See</u>, <u>supra</u>, p. 16, n. 4.

that he could not leave his home or that he was under arrest. Based upon these facts and the facts and testimony more fully outlined above, the Court finds the Defendant was not in custody at the time of his conversation with Sgt. Leinart.

Even if the Defendant were in custody at the time of the conversation with Sgt. Leinart, the Court concludes that no interrogation took place. While Sgt. Leinart's decision to discuss stolen property with the Defendant may have been a poor choice, the evidence is simply that the Defendant and Sgt. Leinart were having a discussion, that, like the conversation in <u>Rith,</u> was "not harassing or especially prolonged." 164 F.3d at 1332. There is no evidence in the record of Sgt. Leinart asking questions that he should have known were "reasonably likely to elicit an incriminating response," from the Defendant about the firearm, and, as the Government noted, Sgt. Leinart did not assign great investigative value to the statement about shooting rats since he did not include the statement in any reports about the incident.

In sum, the Court finds that the Defendant was not in custody at the time he made statements to Sgt. Leinart about the gun retrieved by the officers belonging to his brother, who used it to shoot rats. Further, even if the Defendant were in custody, the evidence in the record indicates that the simple conversation was not the functional equivalent of an interrogation. Accordingly, the Court finds that officers were not required to advise the Defendant of his <u>Miranda</u> rights prior to this conversation, and the Court finds that suppression is not warranted.

## IV.    CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing and after reviewing the relevant legal authorities, the Court finds the Defendant's arguments for suppressing the statements he made to officers fail, because the statements were not the product of custodial interrogation and Miranda warnings were not required.    Therefore, it is **RECOMMENDED** that the Defendant's Motion to Suppress **[Doc. 89]** be **DENIED**.[6]

Respectfully Submitted,

     s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

___

[6]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).